536 So.2d 848 (1988)
Eddie BURRELL, et al., etc., Claiborne County Board of Supervisors
v.
MISSISSIPPI STATE TAX COMMISSION.
No. 58054.
Supreme Court of Mississippi.
August 10, 1988.
Rehearing Denied January 18, 1989.
*850 E. Clifton Hodge, Jr., Michael B. Wallace, Jean Hogan Sansing, Phelps, Dunbar, Marks, Claverie & Sims, Jackson, for appellants.
Edwin Lloyd Pittman and Mike Moore, Attys. Gen. by Robert E. Sanders, Sp. Asst. Atty. Gen., Jackson, for appellee.
En Banc.
ROBERTSON, Justice, for the Court:

I. Introduction and Overview

By no means the least insignificant effect of the advent of the Grand Gulf Nuclear Power Plant is the litigation it has spawned. For years political debate has raged regarding the authority to tax Grand Gulf and to enjoy the lagniappe thus generated. Today's appeal tests the legality of the political solution.
For the reasons enumerated below, we find in state law no legal infirmity in the scheme devised. Taxpayers residing in Grand Gulf's home county, however, have asserted claims to relief under federal law, claims which ought be heard and decided on their merits someday, somewhere. As the federal courts have declined subject matter jurisdiction, we remand with instructions that Taxpayers' federal claims be heard within the concurrent jurisdiction of the Chancery Court.

II. Factual Context and Proceedings Below

The Mississippi Legislature, at its 1986 session, adopted House Bill No. 388 (H.B. 388)[1] amending Miss. Code Ann. *851 ง 27-35-309. H.B. 388 exempted from county, municipal and district ad valorem taxes any in-state nuclear generating plant owned or operated by a public utility rendering electrical service within the state. The exemption applied to any such plant which was not (1) otherwise exempt from ad valorem taxes, or (2) owned or operated by an instrumentality of the federal government.
H.B. 388 further provided that any such utility, in lieu of the taxes from which it was thus exempted, would be required to pay annually to the State Tax Commission a sum equal to two percent (2%) of the value of the plant as assessed by the State Tax Commission, but in no event less than $16,000,000.00 for any taxable year. In addition, H.B. 388 provided for distribution of those revenues to the situs county, the most populous incorporated municipality within the situs county, the state's general fund, and the in-state counties and municipalities served by the utility. The distribution plan favored the situs county, particularly in the early years following passage of the act. Under normal ad valorem taxation principles, however, the situs county would receive all of the revenues so generated.
*852 There is, of course, only one such nuclear generating plant in Mississippi at this time: the Grand Gulf Nuclear Power Plant located in Claiborne County. Taxpayers are residents of Claiborne County and are of the view that their county is entitled to all of the ad valorem tax revenues generated by the plant, the same as would be the case for any other assessable and taxable properties within the county. To that end, Eddie Burrell and eight others (hereinafter "Taxpayers"), on August 6, 1986, filed a complaint in the Chancery Court for the First Judicial District of Hinds County. Burrell and four of his Co-Taxpayer Plaintiffs have sued individually and as members of the Claiborne County Board of Supervisors. The other four have sued as taxpayers and citizens of Claiborne County, as private attorneys general, if you will. See Canton Farm Equipment, Inc. v. Richardson, 501 So.2d 1098, 1106 (Miss. 1987). Named as Defendant is the Mississippi State Tax Commission as the agency charged by law with preparing the public utilities assessment roll for each county.
In their complaint Taxpayers seek (1) an order declaring that H.B. 388 and certain purported amendments to the Mississippi Constitution of 1890 are null and void, (2) an injunction restraining enforcement of those provisions, and (3) an injunction mandating that the State Tax Commission issue an assessment roll permitting Claiborne County to tax the Grand Gulf nuclear facility as it would any other property within the county, notwithstanding the provisions of H.B. 388.
On motion of the Commission, the Chancery Court dismissed the complaint with prejudice, holding H.B. 388 (the law exempting Grand Gulf from county tax and imposing a state tax) constitutional and valid legislation. From that dismissal, the Taxpayers appeal, raising five (5) issues.

III. Summary of Issues Presented

We consider the case the parties have presented and as they have presented it. Structurally, Taxpayers first argue that H.B. 388 violates the pre-1983 version of Miss. Const., Art. 4, ง 112 (1890). Assuming such a violation โ which we find โ the question becomes whether H.B. 388 may be saved by two amendments to Section 112, S.C.R. 519 ratified in 1983 and H.C.R. 41, ratified June 3, 1986.[2]
*853 Even if H.C.R. 41 has been validly incorporated into the Constitution, H.B. 388 must hurdle two further obstacles Taxpayers would interpose. First, Taxpayers note that H.B. 388 was enacted in April of 1986, some two months before the validating amendment to Section 112, an amendment possessing no retroactive validation power, or so we are told. Second, Taxpayers charge that H.B. 388 should in law be declared local and private legislation. If this be so, Taxpayers charge that it runs afoul of the substantive limitations of Miss. Const. Art. 4, ง 90(h) (1890) prohibiting tax exemptions and the procedural requirements of Miss. Const. Art. 4, ง 89 (1890) requiring submission to the local and private committees of each legislative house.
Finally, Taxpayers assert error in the Chancery Court's denial of their eleventh hour motion for leave to amend their complaint to assert claims under the Equal Protection Clause of the U.S. Const., Amdt. XIV, ง 1.

IV. The Claims Under "Old" Section 112

The first point need not detain us. Suffice it to say that Taxpayers present a powerful case that H.B. 388 fails under unamended, pre-1983 Section 112 on at least two fronts. First, H.B. 388 violates the uniformity and equality clause, see, Washington County Board of Supervisors v. Greenville Mill, 437 So.2d 401, 403 (Miss. 1983) and State Tax Commission v. Fondren, 387 So.2d 712, 723-24 (Miss. 1980). Old Section 112 did not allow the sort of pretended exemption plus in-lieu tax provided in H.B. 388. See Chicago Rock Island & Pacific Railroad Company v. Robertson, 122 Miss. 417, 84 So. 449 (1920); see also Ethridge, Mississippi Constitution 227, 336-40 (1928). Second, H.B. 388 *854 violates old Section 112 in that it denies Claiborne County the power to tax Grand Gulf which is and ought be taxable property of that county. On this latter point, we regard Brennan v. Mississippi Home Insurance Company, 70 Miss. 531, 13 So. 228 (1893) as incorrectly decided and of quite dubious precedential value.
But Section 112 has been amended. There is no need to consider further the serious constitutional questions here presented unless and until we determine H.B. 388 unconstitutional under Section 112 as it now reads, the matter to which we now turn.

V. Have The People Validly Amended Section 112?

In 1983 and again in 1986, the legislature submitted to the electorate a proposed amendment to Section 112. Each in turn was ratified by the voters. Each amendment is here challenged, the 1983 amendment for lack of power and the 1986 amendment for having been submitted to the electorate in a manner inconsistent with the Constitution.
We consider the 1986 amendment first, where our question on the merits is whether that amendment illegally combined into one what in legal reality are two separate and distinct amendments. If the 1986 amendment survives this challenge and is valid โ and if it possesses ratifying power regarding H.B. 388, our assumption that H.B. 388 violates the "old" Section 112 is of limited consequence. Similarly, Taxpayers' attack upon the 1983 amendment loses much of its sting.
The form and procedure for amending our Constitution are themselves matters of constitutional mandate. Taxpayers argue that the form in which the 1986 amendment was submitted to the voters contravened those strictures. Miss. Const., Art. 15, ง 273 (Supp. 1987). Concretely, H.C.R. 41 presented to the voters the nuclear power plant classification here at issue coupled with a general property classification system for ad valorem taxation purposes. This we are told had the legal effect of combining into one submission two separate and distinct amendments, contrary to Section 273.
The evolution of Section 273 aids understanding. Prior to 1959, Section 273, in relevant part, provided that
... if more than one amendment shall be submitted at one time, they shall be submitted in such a manner and form that the people may vote for or against such amendment separately... .
Miss. Const., Art. 15, ง 273 (1958).
In 1959, that portion of Section 273 was validly amended to provide as follows:
... if more than one amendment shall be submitted at one time, they shall be submitted in such manner and form that the people may vote for or against each amendment separately; and, notwithstanding the division of the Constitution into sections, the Legislature may provide in its resolution for one or more amendments pertaining and relating to the same subject or subject matter, and may provide for one or more amendments to an article of the Constitution pertaining and relating to the same subject or subject matter, which may be included in and voted on as one amendment... .
Our question is whether H.C.R. 41 runs afoul of post-1959 Section 273. Does H.C.R. 41 submit to the electorate multiple amendments which under a faithful reading of Section 273 is proscribed? If the answer be, "No," we need pursue this assignment of error no further. Any infirmity in the 1983 amendment, S.C.R. 519, becomes moot as it was carried forward in relevant part in H.C.R. 41. Moreover, H.C.R. 41 quite apparently empowers the legislature to enact H.B. 388, subject only to the retroactivity and local and private law challenges discussed below.
Our Constitution โ any constitution โ is a document presumed capable of ordering human affairs decades beyond the time of its ratification under circumstances beyond the prescience of the draftsmen. Dye v. State ex rel. Hale, 507 So.2d 332, 342 (Miss. 1987); Frazier v. State By and Through Pittman, 504 So.2d 675, 694 (Miss. 1987); Alexander v. State ex rel. Allain, *855 441 So.2d 1329, 1333 (Miss. 1983). We should read and enforce the Constitution in the manner which best fits its language, is most consistent in principle with the best justification which may be given for that language, and which best serves our state today. See Alexander v. State ex rel. Allain, 441 So.2d 1329, 1334, 1339 (Miss. 1983); Stepp v. State, 202 Miss. 725, 729-30, 735-36, 32 So.2d 447, 447-48, 33 So.2d 307, 309 (1948); Albritton v. City of Winona, 181 Miss. 75, 102-03, 178 So. 799, 806 (1938); Moore v. General Motors Acceptance Corp., 155 Miss. 818, 822-23, 125 So. 411, 412 (1930). These principles inform interpretation of Section 273 as well as more substantive constitutional law.
Constitutions stabilize society. They insulate us from the passions of the moment's majority. Yet societies grow and, it is to be hoped, mature, and no constitution serves well that unreasonably inhibits that growth. An amendment process is vital if our society be vital. Some such notion in part justifies Section 273, whose interpretation should be consistent with that justification. The reading we give Section 273 should also be that which best fits the words employed and as well the life experience those words have enjoyed.
But there is more. Section 273 contemplates separate submission of separate amendments. This is so that persons "may vote for or against each amendment separately." This both in theory and practical effect facilitates a true expression of the will of the people in the amendment referendum process. The language is best justified against a backdrop of sensitivity to the discriminating citizen who just might favor one amendment and oppose another. Still any defensible reading of Section 273 must fit the entire text. That text, whatever it means, recognizes the impracticability of submitting for separate vote every matter that would change within the constitution a point of substance.
We have had no occasion to read post-1959 Section 273, and in that superficial sense we write on a clean slate. What was added in 1959 was the proviso that two arguably overlapping classes of multiple amendments could be "voted on as one amendment." These are:
(a) multiple amendments "relating to the same subject or subject matter," and
(b) multiple "amendments to an article of the Constitution pertaining and relating to the same subject or subject matter."
Surely, the 1959 amendment changes something of Section 273 as it stood before.
Our case law exists as intermediate chapters of the Section 273 chain novel. It is all post-1890 but pre-1959. Those chapters nevertheless inform the meaning of Section 273 today.
Some forty-five (45) years ago, we held that, "[i]n order to constitute more than one amendment [and thus require separate submission under "old" Section 273], the proposition submitted must relate to more than one subject and have at least two (2) distinct and separate purposes not dependent upon or connected with each other." State ex rel. Collins v. Jones, 106 Miss. 522, 563, 64 So. 241, 249 (1914). Past that point, our pre-1959 chapters have not been characterized by consistency. Compare State v. Brantley, 113 Miss. 786, 74 So. 662 (1917) (holding that Laws 1916, ch. 159 satisfied ง 273), and Power v. Robertson, 130 Miss. 188, 93 So. 769 (1922) (quite inconsistently holding that Laws 1916, ch. 159 violated ง 273). Nevertheless, we may glean from the cases interpreting the "old" Section 273 certain principles not without present utility. Certain maxims expressed in those decisions may be found in numerous opinions from other courts construing similar constitutional provisions.
If, in the light of common sense, the proposed amendments have to do with different subjects, if they are so essentially unrelated that their association is artificial, they are not one; but if they may be logically viewed as parts or aspects of a single plan, then the constitutional requirement is met in their submission as one amendment. State v. Brantley, 113 Miss. 786, 799, 74 So. 662, 666 (1917); State v. Cook, 44 Ohio App. 501, 185 N.E. 212 (1932); State v. Alderson, 49 Mont. 387, 142 P. 210 (1914).
*856 The unity of object is to be looked for in the ultimate end, and not in the details or steps leading to the end. Brantley, 113 Miss. 786, 799, 74 So. 662, 666 (1917); Reid v. Jones, 261 Ark. 550, 551 S.W.2d 191 (1977); Holton v. State, 28 Fla. 303, 9 So. 716 (1891).
But we may not merely proceed upon these principles, our history and the justifications enumerated above. Our interpretation is not of multiple amendment referendum clauses generally. Our interpretation must best fit the particular multiple amendment referendum clause numbered Section 273 as it read in 1986. Notwithstanding the principles, justifications and history recited above, multiple amendments "relating to the same subject or subject matter" may be submitted together so that the voter has but two choices: approve them all or reject them all.
It is in light of the teachings of history, the force of principle, and the requirements of justification and fit that we examine the two amendments at issue.[3] H.C.R. 41 as ratified (1) authorized the legislature to deny a county the right to levy taxes on a nuclear-powered electrical generating plant, and (2) altered the classification system for taxation. Taxpayers argue that these two provisions may not logically be viewed as parts or aspects of a single plan, that the goal of one is to shift certain tax revenues from a specific county to the state, while the goal of the other is to classify property and establish the assessment ratio for each class.
Again a page of history.[4] In State ex rel. McClurg v. Powell, 77 Miss. 543, 27 So. 927 (1900), this Court was faced with a challenge to a proposed constitutional amendment based upon the multiple amendments portion of old Section 273. The challenged proposition to amend would have made elective the offices of justice/judge of the supreme, circuit and chancery courts. This would, in effect, have repealed five existing sections of the Mississippi Constitution, three of which authorized the Governor to appoint supreme court justices, and two of which required the districting of the state into circuit and chancery court districts, and the appointment by the Governor of such judges. The Court developed a narrow test in reviewing such proposed amendments by stating:
Whether amendments are one or many must be solved by their inherent nature, by the consideration of whether they are separate and independent of each of the other so that each can stand alone with the other, leaving the constitutional system symmetrical, harmonious, and independent on the subject.
Powell, at 572, 27 So. at 931.
In State ex rel. Collins v. Jones, 106 Miss. 522, 64 So. 241 (1914), this Court was again faced with a challenge to a proposed amendment to the Mississippi Constitution that would make circuit and chancery court judges elected officials instead of appointees of the Governor. Again the challenge was based upon a claim that the proposal was in effect two amendments embodied in one, in violation of old Section 273. The Court, in rendering its decision, heavily criticized Powell as far too narrow. Jones, at 564-65, 64 So. at 249. The Court reasoned that under the Powell approach it would be practically impossible to amend the Constitution, for any amendment that *857 may be proposed could surely be divided to produce multiple amendments. Id. Instead, the Court stated, as the proper test, that:
In order to constitute more than one amendment, the proposition submitted must relate to more than one subject and have at least two distinct and separate purposes not dependent upon or connected with each other. [Emphasis added]
Id. at 545, 64 So. at 243. Upon this basis, and under this more liberal test, the Court found but one "purpose" and "subject" in the proposed amendment.
Jones is our pre-1959 case most consistent in principle with modern Section 273. Indeed, the 1959 amendment to Section 273 may be read as having incorporated the "same subject" test applied by this Court in Jones, supra, and adding an additional "same subject matter" test. The new Section 273 language, however, does not include the "two distinct and separate purposes" part of the Jones formulation. This is significant in that two amendments may be motivated each by a distinct and separate purpose but may yet pertain to and relate to the same subject or subject matter. Current Section 273 thus requires a broader than Jones reading, a proposition this day of dispositive power.
House Concurrent Resolution 41 has as its single subject the revision of constitutional principles regulating Mississippi's ad valorem tax system. In our view the subject of H.C.R. 41 is property classification for ad valorem tax purposes. Nuclear-powered electrical generating plants are one classification of property, along with other utility property, residential property, other real property and the like. There is no natural law of property classification, that being in this state a function of the positive constitutional law. That the light bulb shines as bright, without regard to the power source, imposes no constitutional impediment to separate classification of nuclear and non-nuclear power plants.
Without doubt, a rational voter may have favored the nuclear power plant provisions of the amendment and opposed the other classifications, or vice versa. But within the former provision, a rational voter may have favored conferring legislative power to limit county taxation of such nuclear facilities but opposed the denial of such county taxation authority altogether. And vice versa. And within the remainder of the classification scheme, a rational voter may have approved assessing all single family residences at ten percent of true value, while opposing a fifteen percent assessment ratio for all other real property โ because it is too high or not high enough. The insight of State ex rel. Collins v. Jones, 106 Miss. 522, 564-65, 64 So. 241, 249 (1914) remains with us: that any amendment expressing more than a single thought is inevitably divisible, so that rational voters may favor one part and not another. A brief perusal of the amendments adopted since 1890 makes apparent that practically all run afoul of Taxpayers' reading of Section 273.
Candor requires recognition of the possibility of two wholly distinct political motivations undergirding H.C.R. 41. The general property classification system may be seen as the latest chapter in the legislative effort at evisceration of the effect of State Tax Commission v. Fondren, 387 So.2d 712 (Miss. 1980). The provisions relating to nuclear power plants may be read unrelatedly, as a greedy grab of Claiborne County's newfound pot of gold โ none of the service area counties showed interest in sharing Claiborne County's one time poverty but all want a share of her new found wealth. None of this is of consequence today, for the distinct and separate purposes part of the Jones formulation was not carried forward into post-1959 Section 273.
Careful thought suggests a further blunting of the separate purposes argument. The citizen has some indirect protection against the political ploy of lumping together controversial and attractive amendments, although there is no legal mandate for such. The democratically elected constituent assembly proposes amendments such as H.C.R. 41. That assembly, our legislature, is the citizens' indirect *858 voice. With far greater facility, each legislative house first in committee and then on the floor may haggle and debate the particulars of the multiple amendments. No proposed amendment ever goes on the referendum ballot until it has received a two-thirds majority vote of each house. We do not regard this indirect role of each qualified elector in the shaping of amendments without practical, theoretical or legal significance.
Of course, nothing said thus far has suggested any mathematical or scientific formula into which we might feed the data and receive a right answer to Taxpayers' Section 273 challenge. Integrity in judgment is the essence of the judicial function in such cases and requires in the end that we identify and give deference to the principles of judicial review applicable in today's special context.
Without doubt, our constitutional scheme contemplates the power of judicial review of legislative enactments. Alexander v. State ex rel. Allain, 441 So.2d 1329, 1333 (Miss. 1983). That power may be exercised affirmatively, however, only where the legislation under review be found
in palpable conflict with some plain provision of the... constitution.
Hart v. State, 87 Miss. 171, 176, 39 So. 523, 524 (1905).
On like principles we review concurrent resolutions submitting to the electorate proposed constitutional amendments. The unconstitutionality of a statute or concurrent resolution must be made to appear clearly before this Court has authority to hold the statute or resolution, in whole or in part, of no force or effect. See, e.g., Mississippi Power Co. v. Goudy, 459 So.2d 257, 263, 274 (Miss. 1984); Anderson v. Fred Wagner & Roy Anderson, Jr., Inc., 402 So.2d 320, 321 (Miss. 1981); Clark v. State ex rel. Mississippi State Medical Association, 381 So.2d 1046, 1048 (Miss. 1980); Russell Investment Corp. v. Russell, 182 Miss. 385, 419, 182 So. 102, 107 (1938); Miller v. State, 130 Miss. 564, 585, 94 So. 706, 709 (1923). To state that there is reasonable doubt regarding the constitutionality of an act such as H.C.R. 41 brings one close to conceding it constitutionally valid. Ivy v. Robertson, 220 Miss. 364, 370, 70 So.2d 862, 865 (1954); Russell Investment Corp. v. Russell, 182 Miss. 385, 419, 182 So. 102, 107 (1938); State ex rel. Greaves v. Henry, 87 Miss. 125, 143, 40 So. 152, 154 (1906).
The point is put otherwise. We have dozens of cases stating, often without citation of authority because the point is so clear, that legislative actions are presumed constitutional, albeit rebuttably so, see, e.g., Mississippi Power Co. v. Goudy, 459 So.2d 257, 263 (Miss. 1984); Hart v. State, 87 Miss. 171, 176-77, 39 So. 523, 524 (1905), and this is as true of concurrent resolutions as of statutes. This presumption is not idly accorded. It is based in the fact that a resolution such as H.C.R. 41 comes before this Court sustained and authenticated by the sanction and approval of one of the three great departments of state government. Russell Investment Corp. v. Russell, 182 Miss. 385, 419, 182 So. 102, 107 (1938). See also Fullilove v. Klutznick, 448 U.S. 448, 473, 100 S.Ct. 2758, 2772, 65 L.Ed.2d 902, 920-21 (1980). The legislators who โ by a two thirds majority vote โ have passed the concurrent resolution here under review have taken the same oath as have we to uphold and support the Constitution. See Alexander v. State ex rel. Allain, 441 So.2d 1329, 1347 (Miss. 1983); see also Rostker v. Goldberg, 453 U.S. 57, 64, 101 S.Ct. 2646, 2651, 69 L.Ed.2d 478, 486 (1981).
It has long been settled in this state that, when the constitutionality of a statute is drawn into question, a construction will be placed upon it, if reasonably possible, to enable it to withstand the constitutional attack and to carry out the purpose embedded in the legislative language. Chassanoil v. City of Greenwood, 166 Miss. 848, 860, 148 So. 781, 783 (1933); see also State ex rel. Greaves v. Henry, 87 Miss. 125, 143-44, 40 So. 152, 154 (1906); Hart v. State, 87 Miss. 171, 176-77, 39 So. 523, 524 (1905); Burnham v. Sumner, 50 Miss. 517, 520-21 (1874). The same rule of construction applies when the challenge is leveled at a concurrent resolution under *859 which an amendment to the Constitution has been submitted to the electorate. A like approach applies to the construction of the open-textured language of constitutional provisions such as Section 273; that is, out of deference to the authority and prerogative of the legislature, we will ordinarily afford the gray areas of the Constitution any reasonable construction that will avoid unconstitutionality of the statute. Miller v. State, 130 Miss. 564, 585, 94 So. 706, 709 (1923). This is for the obvious reason that the propriety, wisdom and expediency of a proposed constitutional amendment are questions for the people โ indirectly through their legislature and directly through referendums โ and not this Court. Anderson v. Fred Wagner & Roy Anderson, Jr., Inc., 402 So.2d 320, 321 (Miss. 1981); Russell Investment Corp. v. Russell, 182 Miss. 385, 419, 182 So. 102, 107 (1938).
In the final analysis we have been asked to review judicially not just an enactment of the legislature but a constitutional amendment affirmatively ratified by the people. More so than in ordinary cases of judicial review, we exercise an authority requiring the utmost delicacy. Blodgett v. Holden, 275 U.S. 142, 148, 48 S.Ct. 105, 107, 72 L.Ed. 206, 210 (1927) (Holmes, J.). We should proceed with caution, Russell Investment Corp. v. Russell, 182 Miss. 385, 419, 182 So. 102, 107 (1938); State ex rel. Greaves v. Henry, 87 Miss. 125, 144, 40 So. 152, 154 (1906).
These thoughts in mind, we return to the form and substance of H.C.R. 41, scrutinized under the force of modern Section 273, best and most legitimately read. H.C.R. 41 may fairly be read as relating to a single subject or subject matter: classification of property for ad valorem taxation purposes.[5] Because it may be so read, nothing in Section 273 invalidates H.C.R. 41 nor its ratification and incorporation into Section 112. The assignment of error is denied.

VI. Did The Chancery Court Err In Failing To Hold That, Even If House Concurrent Resolution No. 41 Has Been Validly Adopted, It Does Not Retroactively Validate House Bill No. 388?

Taxpayers argue that ratification in June, 1986, of amended Section 112 in the form of H.C.R. 41 cannot retroactively validate House Bill 388, effective on April 23, 1986. The argument is premised on the theory that laws operate only prospectively.
The public record reflects that H.B. 388 became law on April 23, 1986. Section 8 thereof provides "this act shall take effect and be in force from and after its passage." Miss. Laws, ch. 507, ง 8 (1986). The empowering amendment to Section 112, H.C.R. 41, was approved by the Legislature three weeks earlier โ Senate adoption having occurred on April 1, 1986, and adoption in the House of Representatives on the next day. Miss. Laws, ch. 522 (1986). Popular ratification, however, did not occur until June 3, 1986. The final act of ratification is that which makes a constitution law. Cf. McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 403, 4 L.Ed. 579, 600 (1819).
Taxpayers' argument implicitly recognizes that law can be made to operate retroactively. Rather, they argue that we should not so construe it unless retroactive intent be manifest, citing Mladinich v. Kohn, 186 So.2d 481, 483 (Miss. 1966), regarding retroactive effect of statutes. We have recently given individuals the benefit of post-conduct primary rules enacted for the benefit of the class to which they belong. State ex rel. Pittman v. Ladner, 512 So.2d 1271, 1274-77 (Miss. 1987). We often give individuals the benefit of retroactive *860 application of new judge-made law.[6]See Hall v. Hilbun, 466 So.2d 856, 875-77 (Miss. 1985); Keyes v. Guy Bailey Homes, Inc., 439 So.2d 670, 672-73 (Miss. 1983).
Taxpayers direct our attention to a general statement of the rule they say obtains in determining whether a constitutional amendment should be given retroactive effect, so as to validate a previously enacted statute:
A constitutional provision may ratify and validate a previously enacted statute, but it will not so operate unless an intention to do so is clearly manifested ... an act of a legislature not authorized by the constitution at the time of its passage is absolutely void, and, if not reenacted, is not validated by a subsequent amendment to the constitution.
16 C.J.S. Constitutional Law ง 44 at 122 (1984).
We have no quarrel with this general principle, though the quoted expression is a bit too strong. More importantly, we find an exception to it, in that statutes enacted in anticipation of the adoption, or the taking effect, of constitutional amendments that prescribe the manner of effectuating such amendments, are valid in the absence of a constitutional provision prohibiting such legislation at the time of passage. See Lee v. Superior Court, 191 Cal. 46, 214 P. 972, 974-75 (1923); Boyd v. Olcott, 102 Or. 327, 202 P. 431, 447-48 (1921); 16 C.J.S. Constitutional Law, ง 44 at 123 (1984). Ratification of such an amendment relates back and validates the legislation.
The outcome-determinative question is whether legislative enactment of House Bill No. 388 was so integrally related to the adoption of House Concurrent Resolution 41, so that the latter, once ratified, ought be taken as breathing legal life into the former. A combined reading of the history recited above and the language of H.C.R. 41 permits only the "Yes" answer.
H.C.R. 41 and H.B. 388 were passed during the 1986 Regular Session of the Mississippi Legislature. They were part and parcel of a legal revamp of property classification for ad valorem tax purposes. Valid promulgation of each was prerequisite to the success of the scheme. The tax liabilities created pursuant to Section (3)(b) of House Bill No. 388 would not be payable until February 1, 1987. Assuming arguendo that there may have been a constitutional impediment to enforcement of House Bill No. 388 in April, 1986, that impediment was effectively removed in June of 1986. The assignment of error is denied.

VII. Did The Chancery Court Err In Holding House Bill 388 To Be A General Law Instead Of Invalid Local and Private Legislation?

Taxpayers argue that House Bill No. 388 is constitutionally local and private legislation and invalid twice over. Substantively, Taxpayers point to Section 90(h) of the Mississippi Constitution which prohibits the passage of local, private or special legislation in the exemption of property from taxation, or from levy or sale. This argument is made in light of the fact that Section 112, as amended by H.C.R. 41, facially, provides for the exemption of property from taxation only by general laws. Procedurally, Taxpayers note Section 89 which requires that all local and private bills be considered by and reported out of the local and private committees of each house.
The general principle operative here is Miss. Const. Art. 4, ง 87 (1890): "No special or local law shall be enacted for the benefit of individuals or corporations, in cases which are or can be provided for by general law... ." This principle remains intact even with the amendments to Section 112 of the Constitution approved above. *861 Our question, thus, is whether H.B. 388 is a "special or local law".
A law is "general" when it operates uniformly on all members of a class of persons, places, or things requiring legislation peculiar to the case dealt with. City of Jackson v. Deposit Guaranty Bank & Trust Co., 160 Miss. 752, 766, 133 So. 195, 197 (1931); State ex rel. Knox v. Speakes, 144 Miss. 125, 155-56, 109 So. 129, 132 (1926). Additionally, where the classification that has been drawn by the legislature is one that exempts property from taxation, the only limit upon legislative power is that, "the exemption shall not be arbitrary; that is to say that it must have some just and rational relation to the promotion of the public welfare." Id. at 767, 133 So. at 198.
In cases dealing with classifications drawn by the legislature in statutes and laws, we have said:
The question of classification is one primarily for the legislature, and in the exercise of this power the legislature possesses a wide discretion. We have also held in view of the presumptions in favor of a legislative judgment as to classification, the legislative judgment will be upheld if any state of facts can reasonably be conceived to sustain it, and can be overthrown by the courts only when it is clearly erroneous. [Emphasis added]
Jackson Redevelopment Authority v. King, Inc., 364 So.2d 1104, 1107-08 (Miss. 1978); Board of Education v. State Educational Finance Commission, 243 Miss. 782, 814, 138 So.2d 912, 926 (1962). See also Comment, General Special, Local and Private Legislation: A Mississippi Overview, 56 Miss.L.J. 327, 334-46 (1986).
Taxpayers argue that there is no rational distinction between nuclear power plants and other power plants for taxing purposes. But, nowhere is the power of classification accorded more latitude than in the field of taxation, and the state may tax certain kinds of property, yet exempt others. Sharpe v. Standard Oil Co., 322 So.2d 457, 461 (Miss. 1975). In Sharpe, this Court observed the great latitude in tax classification cases by noting that:
In Broad River Power Co. v. Query, 288 U.S. 178, 53 S.Ct. 326, 77 L.Ed. 685 (1933), a suit was filed contesting the validity of a South Carolina law that taxed the production of hydroelectric power but not the production of electricity by oil or internal combustion engines... . The Court held that the existence of comparatively few internal combustion electric plants was sufficient reason for creating the tax classification. 288 U.S. at 179-80, 53 S.Ct. at 327, 77 L.Ed. at 686.
Id. As such, a close comparison can be drawn to the distinction made by the legislature between nuclear and non-nuclear power plants in House Bill No. 388 for the purpose of exclusion from taxation.
Along similar lines, Taxpayers assert that there is no rational distinction between the in-lieu tax provided for by House Bill No. 388 and those provided for by House Bill No. 387. House Bill No. 387 specifically provided for a different manner of in-lieu taxes to be paid on the Yellow Creek Nuclear Plant, which is owned and operated by the Tennessee Valley Authority in Tishomingo County, Mississippi, than those to be paid by privately owned nuclear generating plants. This Court will uphold legislative judgment in deriving a classification if any state of facts can reasonably be conceived to sustain it. Jackson Redevelopment Authority, supra. As the difference between taxing privately owned property and that owned by the federal government is readily apparent, the classification is valid.
Finally, Taxpayers argue that House Bill No. 388 is local and private legislation because under its terms, it can only apply to the Grand Gulf facility in Claiborne County. Taxpayers specifically point to the provision in Section 2 of House Bill No. 388 which provided for a decreasing payment schedule to the situs county of the nuclear plant beginning in 1987 with a fifty percent payment, gradually diminishing to thirty percent by 1991, which will be the figure paid to any situs county thereafter. *862 In regard to this argument, this Court's long-standing rule is that:
Where a law is broad enough to reach every portion of the state and to embrace within its provisions every person or thing distinguished by characteristics sufficiently marked and important to make them clearly a class by themselves, it is not a special or local, but a general law even though there may be but one member of the class or one place on which it operates. [Emphasis added]
Jackson Redevelopment Authority, 364 So.2d at 1107. Vardaman v. McBee, 198 Miss. 251, 260, 21 So.2d 661, 664 (1945); see also Comment, General, Special, Local and Private Legislation: A Mississippi Overview, 56 Miss.L.J. 327, 333 (1986). The real question is whether every person that can be brought within its predicament becomes subject to its operation. Delta & Pine Land Co. v. Board of Supervisors, 228 So.2d 893 (Miss. 1969). As House Bill No. 388 will "bring into its predicament" any privately owned nuclear facilities built in the future, it does not comprise local and private legislation.[7] The assignment of error is denied.

VIII. Did The Chancery Court Err In Failing To Permit The Plaintiffs To Amend Their Complaint To Assert That House Bill No. 388 Violates The Equal Protection Clause Of The Fourteenth Amendment?

In addition to the present action, Taxpayers sued in the United States District Court for the Southern District of Mississippi, challenging House Bill No. 388 on various grounds, including an assertion that it violated the Equal Protection Clause of the Fourteenth Amendment. A trial was had from November 24, 1986, to November 26, 1986. In a judgment rendered on December 31, 1986, the District Court held that it lacked jurisdiction to hear the Taxpayers' federal constitutional claims by virtue of the Tax Anti-Injunction Statute, 28 U.S.C. ง 1341. The Supreme Court of the United States ultimately affirmed without opinion. Burrell v. Allain, ___ U.S. ___, 107 S.Ct. 3179, 96 L.Ed.2d 668 (1987).
On January 6, 1987, Taxpayers moved for leave to amend their complaint in the present action to invoke 42 U.S.C. ง 1983 and assert a claim that Senate Concurrent Resolution No. 41, and House Bill No. 388 violate the Equal Protection Clause of the Fourteenth Amendment. Undeniably, this was late in the day, as on October 8, 1986, the Chancery Court had granted the Commission's motion for summary judgment. The matter remained alive on Taxpayers' motion for a rehearing filed on October 17, 1986. See Rule 59, Miss.R.Civ.P. On January 13, 1987 โ one week after the motion to amend was filed โ the Court overruled all pending motions, including the Taxpayers' motion to amend their complaint.
Taxpayers now argue that the Chancery Court was in error, in denying their motion to amend in that amendments to pleadings should be "freely given when justice so requires" under Rule 15, Miss.R.Civ.P.
The granting or denial of a motion for leave to amend under Rule 15 is addressed to the sound discretion of the trial judge. Red Enterprises, Inc. v. Peashooter, Inc., 455 So.2d 793, 796 (Miss. 1984); 3 Moore's Federal Practice (2d ed. 1984) ง 15.08(4); 6 Wright and Miller, Federal Practice and Procedure (1971) ง 1484. As such, this Court's scope of review is limited in that we have authority to reverse only where we are convinced that the trial judge abused his discretion. Bourn v. Tomlinson Interest, Inc., 456 So.2d 747, 749 (Miss. 1984), citing Forman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962).
Ordinarily we would be loath to disturb a trial court's post-judgment denial of a motion to amend to assert a new theory and claim. In determining whether the court below abused its discretion, we must consider the special context of today's case. *863 As we will presently demonstrate, Taxpayers have a right to be heard on their Section 1983/Equal Protection claims. Their allegations are more than sufficient to withstand threshold scrutiny under Rule 12(b)(6) and, indeed, Rule 56, summary judgment. The federal courts, however, have held that they have no jurisdiction to hear Taxpayers' claims. By denying the motion to amend, the Chancery Court created the anomalous circumstance of Taxpayers with a justiciable claim upon which they were entitled to be heard but with no forum willing to hear it. Here lies the key to the Chancery Court's abuse of discretion.
But first things first. The Chancery Court of the First Judicial District of Hinds County was indeed a court having authority to hear and adjudge Taxpayers' properly pleaded claims under 42 U.S.C. ง 1983 and the Equal Protection Clause. Marx v. Truck Renting & Leasing Association, Inc., 520 So.2d 1333, 1346 (Miss. 1987). That the point be removed from doubt, we set forth the premises more fully.
The Supremacy Clause of the Constitution of the United States, Article VI, cl. 2, provides that all valid enactments of Congress shall be the supreme law of the land.
And the Judges in every State shall be bound thereby, anything in the Constitution or Laws of any State to the contrary notwithstanding.
The Constitution contemplates that state courts have concurrent jurisdiction with federal courts in the enforcement of federally created rights. Hamilton, The Federalist Papers, No. 82.
The Supreme Court has recognized time and time again that state courts have the duty to enforce federally created rights. Claflin v. Houseman, 93 U.S. (3 Otto) 130, 136-37, 23 L.Ed. 833 (1876); Mondou v. New York, N.H. & H.R. Co., 223 U.S. 1, 55-58, 32 S.Ct. 169, 177-78, 56 L.Ed. 327, 348-49 (1912); Testa v. Katt, 330 U.S. 386, 389-91, 67 S.Ct. 810, 812-13, 91 L.Ed. 967, 970-71 (1947); Charles Dowd Box Co. v. Courtney, 368 U.S. 502, 507, 82 S.Ct. 519, 527, 7 L.Ed.2d 483, 487 (1962). A state court may not refuse to enforce a right arising under a statute of the United States because it may disagree with that statute or question the wisdom of Congress in the enactment of that statute. Minneapolis & St. Louis Railroad Co. v. Bombolis, 241 U.S. 211, 222, 36 S.Ct. 595, 598, 60 L.Ed. 961, 965 (1916).
This Court has recognized, as a general proposition, that this state's courts exercise concurrent jurisdiction with federal courts in the enforcement of federally created rights. The only exceptions to this rule are those cases in which the federal statutes expressly provide for exclusive jurisdiction in the federal courts. Koehring Co. v. Hyde Construction Co., Inc., 254 Miss. 214, 229, 178 So.2d 838, 842-43 (1965); Masonite Corp. v. International Woodworkers of America, AFL-CIO, 215 So.2d 691, 696 (Miss. 1968); Lewis v. Delta Loans, Inc., 300 So.2d 142, 144-45 (Miss. 1974). The courts of this state are not free to refuse adjudication of claims brought under the Constitution and laws of the United States. Indeed, we enforce such rights even when convinced that their federal source has erred greatly. Sanders v. State, 429 So.2d 245, 248, 251 (Miss. 1983); Bolton v. City of Greenville, 253 Miss. 656, 666, 178 So.2d 667, 672 (1965). If the ordinary jurisdiction of the state court is adequate to the case, the court must accept jurisdiction and proceed to enforce federally created rights. Lewis v. Delta Loans, Inc., 300 So.2d 142, 144-45 (Miss. 1974).
This Court has in fact recognized the duty and obligation of the courts of this state to enforce rights created under a variety of federal statutes:
(a) Fair Labor Standards Act: Mengel v. Ishee, 192 Miss. 366, 4 So.2d 878 (1941);
(b) Carmack Amendment to Interstate Commerce Act: Illinois Central Railroad Co. v. Terry, 137 Miss. 371, 380-81, 102 So. 391 (1924);
(c) Federal Employees Liability Act: Illinois Central R.R. Co. v. Coussens, Admx., 223 Miss. 103, 77 So.2d 818 (1955);
(d) Jones Act: Larry v. Moody, 242 Miss. 267, 274, 134 So.2d 462, 464 (1961); *864 Standard Products, Inc. v. Patterson Admx., 317 So.2d 376, 378 (Miss. 1975); Penrod Drilling Co. v. Bounds, 433 So.2d 916, 928-29 (Miss. 1983) (Robertson, J., concurring);
(e) Labor Management Relations Act of 1947: Masonite Corp. v. International Woodworkers of America, AFL-CIO, 215 So.2d 691, 695 (Miss. 1968);
(f) Truth in Lending Act: Brown v. Credit Center, Inc., 444 So.2d 358, 366 (Miss. 1983); Lewis v. Delta Loans, Inc., 300 So.2d 142, 144-45 (Miss. 1974);
(g) Contract Settlement Act: Walsh Construction Co. v. Davis, 204 Miss. 509, 37 So.2d 757 (1948).
The Supreme Court has recently reaffirmed the proposition that state courts have concurrent jurisdiction with the federal courts over claims brought under 42 U.S.C. ง 1983 for violations of rights secured by the Constitution and laws of the United States. Martinez v. California, 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980). Absent some federally imposed limitation on the Section 1983 action, the courts of the State of Mississippi have subject matter jurisdiction thereof โ concurrent with the courts of the United States.[8]State Tax Commission v. Fondren, 387 So.2d 712, 723 (Miss. 1980). When Mississippi courts are enforcing rights created under federal law, the Mississippi courts must follow the interpretations of those rights provided by federal courts. Illinois Central Railroad Co. v. Coussens, Admx., 223 Miss. 103, 113, 77 So.2d 818, 821 (1955); Saunders v. Mullins, 412 So.2d 245 (Miss. 1982).
To be sure, State Tax Commission v. Fondren, 387 So.2d 712, 723 (Miss. 1980), says that the state courts have no authority to entertain claims under Section 1983 where the suit is one seeking to enjoin unconstitutional state action with regard to the collection of taxes. Fondren confuses a federal jurisdictional limitation, 28 U.S.C. ง 1341, with the enforceability of a federally created right and remedy in state court. Much of the wind has been taken from Fondren's sails by Fair Assessment In Real Estate Association, Inc. v. McNary, 454 U.S. 100, 102 S.Ct. 177, 70 L.Ed.2d 271 (1981). Indeed, our recent decision in Marx v. Truck Renting and Leasing Association, Inc., supra, may only be read as holding that the Section 1983/1988 discussion in Fondren stands overruled.
These things said, we return to whether the Chancery Court abused its discretion in overruling Taxpayers' motion for leave to amend to assert a Section 1983/Equal Protection claim. We regard this a case of great public interest. Justice demands as law permits that this claim be heard and decided on its merits โ somewhere. The federal judiciary has declared that it has no subject matter jurisdiction. Ordinary notions of res judicata would preclude a new lawsuit in some state court. The only available alternative is allowing the amendment in the present action.
Under the arguably unique facts and circumstances of this case, we hold that the Chancery Court abused its discretion when it denied the motion to amend. We reverse that portion of the judgment below and remand with instructions that the amendment be allowed and such further proceedings had as may be appropriate and not inconsistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART AND REMANDED
ROY NOBLE LEE, C.J., and PRATHER and ANDERSON, JJ., join in this opinion.
HAWKINS and DAN M. LEE, P.JJ., SULLIVAN and GRIFFIN, JJ., dissent to sections I-VII and concur to section VIII by separate written opinion.
ZUCCARO, J., not participating.
HAWKINS, Presiding Justice, dissenting:
I concur with Part VIII of the majority opinion that this cause should be reversed *865 for the reason the majority has stated in Part VIII.
I respectfully dissent from the remainder of the majority opinion, however.
I would hold H.C.R. 41 (HCR 41), a frightening example of logrolling, to be in violation of the prohibition against requiring a single vote on more than one amendment contained in ง 273 of our Constitution.
Far more dangerous, however, than the Legislature submitting HCR 41 to the electorate, is the majority's view that the present ง 273 has absolutely no prohibition against logrolling. The majority's construction of the present ง 273 emasculates the basic purpose behind all such constitutional provisions: to prevent logrolling. "Logrolling" is pernicious. Kerby v. Luhrs, 44 Ariz. 208, 211-14, 36 P.2d 549, 551, 94 A.L.R. 1502, 1506 (1934). What is "logrolling" in a proposed constitutional amendment? It is the unnecessary inclusion within the same proposed amendment of more than one proposition to be voted on in which the voter may very well wish to see one put into effect, but the other defeated.
It is universally condemned by courts. It is regarded as a "species of legal fraud." State ex rel. Becker v. Smith, 335 Mo. 1046, 1049, 75 S.W.2d 574, 575 (1934); State v. Holman, 296 S.W.2d 482, 488 (Mo. 1956).[1]
As every informed citizen now knows, Section 112 of our Constitution required taxation to be uniform and equal throughout the state, and assessed and taxed in proportion to its true value. This constitutional section was not being followed by the taxing authorities of this state, and in the seminal case of State Tax Commission v. Fondren, 387 So.2d 712 (Miss. 1980), this Court held that all counties and taxing authorities would have to abide by Section 112. Also, see: Fondren v. State Tax Commission, 350 So.2d 1329 (Miss. 1977).
Our Legislature, concerned with the mandate of State Tax Commission v. Fondren to apply Section 112 as written, and in order to ameliorate it, in 1982 passed S.C.R. 519, Chapter 622, Laws of 1982 (SCR 519), submitting to the people a proposed amendment to Section 112, which was ratified by the people on November 2, 1982.
I will return to SCR 519, and the 1982 amendment to Section 112 later. First, I wish to address the 1986 amendment to Section 112.[2]
Not satisfied with the 1982 amendment, the Legislature on April 2, 1986, passed HCR 41, Chapter 522, Laws of 1986 (HCR 41). Again, the purpose of the proposed amendment was to amend the uniformity requirement of the original Section 112. It was submitted to and ratified by the electorate on June 3, 1986.
Let us analyze what HCR 41 sought to do. Rather than requiring all property to be assessed in proportion to its true value, as in the original Section 112, the proposed amendment authorized the division of property into five classes, and made provision that each class would be assessed at a certain percentage of its true value.
The classes and their percentage of assessment were:
Class I, owner-occupied single family residential realty, ten percent (10%) of true value, with the Legislature authorized by general laws to establish acreage limitation.

*866 Class II, all other realty, except for public utilities and Class I realty, fifteen percent (15%) of true value.
Class III, personal property, except for motor vehicles and public utilities, fifteen percent (15%) of true value.
Class IV, public utility property owned by public service corporations and required by general laws to be appraised and assessed by the state or county, excluding railroads and airlines and motor vehicles, thirty percent (30%) of true value.
Class V, motor vehicles, thirty percent (30%) of true value.
It is no doubt true that the average voter who voted on the proposed amendment would have one or more classes in which he owned property, and would be interested in having that class in which he owned property assessed at a low percentage, yet was required to make a choice of accepting all or rejecting all. Thus, the owner of a fleet of motor vehicles no doubt would have preferred the opportunity of voting on Class V separately from the others.
Had each of these five classes been voted on separately, however, a unified, coherent system of ad valorem taxation would have been impossible. It was necessary to put all classes of property into one proposed amendment. It certainly cannot be pretended that it was unnecessary to put the proposed assessment of each class of property into one amendment.
Had the Legislature stopped there, the basic purpose of the proposed amendment would have been fully and lawfully accomplished. Instead, the Legislature inserted a proposal foreign to the basic purpose and totally unnecessary to its accomplishment.
There is but one nuclear-powered electrical generating plant in Mississippi, and it is highly unlikely there will be another in this state in the foreseeable future. This plant is located in Claiborne County, and pays several millions of dollars in ad valorem taxes each year.
HCR 41 also authorizes the Legislature to deny or limit Claiborne County the right to levy county or special taxes on this plant, and instead authorizes the Legislature to provide its own special mode of valuation, assessment and levy, and then to distribute the tax revenue therefrom.
Thus,
1. The nuclear power plant was not placed in any of the five classes for assessment, but was removed from them.
2. The Legislature is given the power by general law to limit or deny Claiborne County or any other taxing authority the right to levy any taxes on this facility.
3. The Legislature also is given the power by law to provide its own mode of valuation, assessment and levy of taxation of the plant.
4. And finally, all income derived from the plant will be distributed as the Legislature chooses by law to prescribe.
The overall purpose and design of the proposed amendment to Section 112, or course, was to set uniform, blanket rules as to the assessment and valuation of all property throughout the state.
There was no necessity to place the Claiborne County nuclear plant proposal in the same proposed amendment. With no additional expense, each question could have been submitted separately to the people at the same time. Had the people been afforded separately and independently the opportunity to decide (1) whether they approved of the five classes of valuation and assessment of all property in this state in one question, and (2) whether they approved of the unique scheme as to the Claiborne County nuclear plant in another question, that would have been fair and reasonable.
Then, why was this salutary procedure not followed?
In the first place, HCR 41 said to the people in counties which stood to benefit from the millions of dollars otherwise going to Claiborne County: you may not like *867 the change in assessment and valuation in the proposed amendment, but if you vote for it, your taxes are going to be reduced from the Claiborne County windfall.
On the other hand, the people of Claiborne County had every reason to vote against the proposed amendment because their county was going to lose millions of dollars each year in tax revenue.
Were the people of Mississippi given a fair vote on these two questions?
In fact, the Legislature did not leave any doubt in the people's mind as to what it proposed to do with the tax revenue from the plant. On April 23, 1986, and well before the was HCR 41 submitted to the people on June 3, the Legislature passed H.B. 388, Chapter 507, Laws of 1986 (HB 388). With reference to the plant, this Act exempted it from county, municipal and district ad valorem taxation.
Next, the Act requires the State Tax Commission, using accepted methods of appraisement, to determine the "in lieu tax" due thereunder, which assessment is not to be placed on the tax rolls of the county, and not subject to ad valorem tax by the county.
Under HB 388 each year the plant is required to pay a sum equal to two percent (2%) of its assessed value, but in no event less than $16,000,000 to the tax commission. All sums in excess of $16,000,000 are to be paid into the General Fund of the state.
As to the $16,000,000 minimum, in 1987 Claiborne County is to get fifty percent (50%), in 1988 forty-five percent (45%), in 1989 forty percent (40%), in 1990 thirty-five percent (35%), in 1991 and thereafter thirty percent (30%). The Act further requires certain limitations and restrictions on expenditures of the funds received by Claiborne County.
As to the remaining funds, ten percent (10%) is to go in the General Fund, and as to the balance, the Act states:
CHAPTER NO. 507
HOUSE BILL NUMBER 388
SECTION 1. Section 27-35-309, Mississippi Code of 1972, is amended as follows:
* * * * * *
(3) (c) ... the balance shall be distributed to the counties and municipalities in this state wherein such public utility renders electric service in the proportion that the amount of electric energy consumed by the retail customers of such public utility in each county, excluding municipalities therein, and in each municipality for the next preceding fiscal year bears to the total amount of electric energy consumed by all retail customers of such public utility in the State of Mississippi for the next preceding fiscal year.
(d) No county, including municipalities therein, shall receive in excess of twenty percent (20%) of the funds distributed under paragraph (c) of this subsection.
(e) The revenues received by counties and municipalities under paragraph (c) of this subsection shall be included and considered as proceeds of ad valorem taxes for the purposes of the growth limitation on ad valorem taxes for the 1987 fiscal year and thereafter under Sections 27-39-321 and 27-39-305.
Thus the people were not only voting on the proposed amendment of Section 112, but HB 388 as well.[3]
The Mississippi Public Service Commission records indicate that 45 counties in the state are served by Mississippi Power and Light Company, and therefore eligible to receive tax revenue which would otherwise go to Claiborne County.[4]
The official statistics show that the June 3, 1986, vote on HCR 41 was quite close. The proposed amendment was ratified by only fifty and six-tenths percent (50.6%) of the entire electorate. Fifty-three and one-half percent (53.5%) of the electorate of the 37 counties not serviced by the power company voted against the proposed amendment. The 45 counties serviced by the power company, and excluding Claiborne County, ratified the proposed amendment *868 by a 52% vote.[5]
It would be strange indeed if the mayors and boards of aldermen of the municipalities, and the supervisors of the counties substantially served by this plant were not sorely tempted in seeing HCR 41 ratified. Including the nuclear power plant proposition was a "strong monetary inducement," to say the least, to pass the entire package.[6]
As for Claiborne County, combining these propositions had the effect of disenfranchising its entire electorate. How could a citizen of Claiborne County possibly vote his best interest with the propositions combined?
There is no way to escape the obvious: in combining these two serious questions and making the people either accept them both or reject them both, a grave injustice was inflicted upon all our citizens. This election was not fair.
Add this anomaly: why did the Legislature pass HB 388 before the people had the opportunity to vote on HCR 41? Whoever heard of the Legislature passing a law โ invalid on its face โ before the requisite Constitutional amendment to make that law valid has been adopted by the people?
A court should ever bear in mind the purpose behind any Constitutional provision, the basic reason it is there. A review of cases throughout the United States reveal that there are two basic purposes behind a constitutional prohibition against submitting more than one amendment in a single package. Fugina v. Donovan, 259 Minn. 35, 104 N.W.2d 911, 914 (1960), states:
The constitutional mandate that multifarious amendments shall be submitted separately has two great objectives. The first is to prevent imposition upon or deceit of the public by the presentation of a proposal which is misleading or the effect of which is concealed or not readily understandable. The second is to afford the voters freedom of choice and prevent "logrolling," or the combining of unrelated proposals in or to secure approval by appealing to different groups which will support the entire proposal in order to secure some part of it although perhaps disapproving of other parts.
In this case we are concerned with the second "great objective" of the constitutional proscription: to prevent logrolling. Political scientists and constitutional scholars will search in vain for a more classic example of logrolling at its most outrageous than HCR 41.
Kerby v. Luhrs, supra, is illustrative. Article 21, Section 1 of the Arizona Constitution had a provision almost identical to that contained in Section 273 of our Constitution. It provided:
[I]f more than one proposed amendment shall be submitted at any election, such proposed amendments shall be submitted in such manner that the electors may vote for or against such proposed amendments separately."
The Arizona Supreme Court struck down a proposed amendment to that state's constitution which embraced as one proposition taxation of copper mines and of public utilities, and also established a tax commission as a constitutional body. The Court held there were three distinct propositions, no two of which were necessarily required for a proper operation of the third. The Court then held:
[T]heir only connection is that they are all embraced in a broader general subject, to wit, that of taxation. It is clear that the provision in regard to the method in which copper mines should be taxed is in no way necessary to or concerned with the method of taxation of public utility corporations, and it is equally clear that both of those propositions could be inserted in the Constitution without the slightest need of adopting *869 the one establishing the tax commission as a constitutional body which in effect would be independent of the regular executive and legislative branches of the state government in many particulars, and perhaps even of the judicial.
Looking at the proposition as reasonable men, we are of the opinion that the proposed amendment is a most glaring violation of the constitutional provision involved, in that it submits three separate propositions upon which each voter might, and many doubtless would, have widely different opinions, and in such a manner that they are compelled either to reject all three on account of one which they may consider vicious, or else to accept two provisions they disapprove to secure the adoption of one which meets their favor. Such an amendment is logrolling of the worst type, and violates both the spirit and the letter of the Constitution.
36 P.2d at 554-555.
The Court began its analysis by noting that constitutional provisions were interpreted in light of their purpose. Because the opinion sets forth the prevailing view with far greater clarity than I can muster, I quote extensively:
It is a cardinal axiom of interpretation of all written instruments that they are to be construed in the light of their purpose, and this is particularly applicable to Constitutions, which are by necessity general in their nature, and presumably intended to remain in force for a long period of time. It is therefore held that they are to be construed in the light of the exigencies and conditions which they are intended to meet and deal with. [citations omitted] It was agreed by counsel for both plaintiff and defendant at the oral hearing of this case that there is no doubt the constitutional provision above quoted was intended to prevent the pernicious practice of "logrolling" in the submission of a constitutional amendment. This so-called logrolling may be illustrated as follows: Three interested parties are desirous respectively of securing the enactment into law of three distinct propositions, A, B, and C. These propositions are so essentially dissimilar that it is obvious that the legislators, who must pass thereon, will probably be divided in their opinion as to their merit. Some of them may earnestly desire proposition A, while being opposed, though in a lesser degree, to B and C. Others consider the enactment of proposition B of paramount importance, while objecting to A and C, while the members of a third group are willing to sacrifice their convictions on A and B for the sake of securing C. The original framers of the three propositions, realizing this situation, place them all in one measure, so that a legislator must vote either yes or no on the measure as a whole. He is thus forced, in order to secure the enactment of the proposition which he considers the most important, to vote for others of which he disapproves. Such practices have been universally condemned by impartial students of public affairs, and yet they are notoriously prevalent in all Legislatures... . But, if these actions are evil in the Legislature, where they deal only with statutes, much more are they vicious when constitutional changes, far-reaching in their effect, are submitted to the voters. [Emphasis added] The principle involved is well summed up in the dissenting opinion of Justice Graves in State ex rel. v. Gordon, 223 Mo. 1, 122 S.W. 1008, 1018 [(1909)]. While in that case Justice Graves was in the minority, in the later case of State v. Gordon, 268 Mo. 321, 188 S.W. 88 [(1916)], the majority opinion in the case first cited was expressly overruled and the reasoning of Justice Graves adopted. He said:
* * * Propositions relative to the taxing power of the state, and propositions to be voted upon by the plain people, must be plainly stated, and in single and substantial form. Not only so, but they must be so stated as to avoid what has been denominated by the courts as "logrolling" in the interest of a combined proposition, which would not occur in the interest of a single proposition. The courts in the *870 administration of justice, and without any reference to constitutional mandates, have discovered that doubleness of propositions to be voted upon by the public was inducive of fraud, and that it was uncertain whether either of two or more propositions could have been carried by vote had they been submitted singly. To obviate this fraud upon the taxing power of the state this court, up to the present time, and excepting the present case, has consistently turned its face against doubleness of propositions and the frauds which are the necessary outgrowth thereof.
* * * * * *
[I]n 32 American and English Encyclopedia of Law (2d Ed.) 47, it is said: "Two propositions cannot be united in the submission so as to have one expression of the vote answer both propositions, as voters might be thereby induced to vote for both propositions who would not have done so if the questions had been submitted singly."
This announcement of the general doctrine is not only in full accord with the cases in Missouri,, but with all of the jurisdictions to which our attention has been called. And if we be called upon to assign a reason for this salutary rule, that reason would be that the taxing power of the state should be exercised with the utmost openness and fairness, and without opportunity for "jockeying" and "logrolling." In other words, the courts of the country generally, in matters which go to the exercise of the taxing power of the state, have been exceedingly cautious to see that such power was exercised by a fair expression at the election held for such purpose. The question is not whether a constitutional mandate has been followed, but whether the proposition submitted is one which tended within itself and upon its face to induce "jockeying" and "logrolling" in order to carry a combined proposition. That such things may be done is apparent to all thinking minds. * * *
There is and can be no disagreement as to the evil the constitutional provision was intended to prevent, and many states, recognizing that evil, have adopted provisions in their Constitution like ours in order to prevent it. The difficult question, however, is to determine what test shall be used to ascertain whether there are in reality several amendments submitted under the guise of one.
We have carefully examined all the cases cited by both counsel for the plaintiff and for the defendant. Apparently the first in point of time which lays down such a test is State v. Timme, 54 Wis. 318, 11 N.W. 785, [791]. Therein the Court said:
* * * * * *
We think amendments to the constitution, which the section above quoted requires shall be submitted separately, must be construed to mean amendments which have different objects and purposes in view. In order to constitute more than one amendment, the propositions submitted must relate to more than one subject, and have at least two distinct and separate purposes not dependent upon or connected with each other. * * * [Emphasis added]
The Arizona Court further quoted from this Court's opinion in State ex rel. McClurg v. Powell, 77 Miss. 543, 27 So. 927, 931, 48 A.L.R. 652, wherein we held:
[W]hether amendments are one or many must be solved by their inherent nature โ by the consideration whether they are separate and independent each of the other, so as that each can stand alone without the other, leaving the constitutional scheme symmetrical, harmonious, and independent on the subject and not upon the mere blanketing of a name, such as "amendments relating to the judicial department," or "amendments relating to the executive department" or to the "legislative department."
The Court then emphasized the holding Lobaugh v. Cook, 127 Iowa 181, 102 N.W. 1121, 1123 (1905):

*871 [T]hat the necessity of the incidental change must exist, in order to justify its inclusion with the main proposition, we entertain no doubt.
In other words, the Court said, if it is not necessary to vote on the two propositions as one, it is necessary not to vote on them as one.
The Arizona Court then gave the test which HCR 41 so clearly flunks:
If the different changes contained in the proposed amendment all cover matters necessary to be dealt with in some manner, in order that the Constitution, as amended, shall constitute a consistent and workable whole on the general topic embraced in that part which is amended, and if, logically speaking, they should stand or fall as a whole, then there is but one amendment submitted. But, if any one of the propositions, although not directly contradicting the others, does not refer to such matters, or if it is not such that the voter supporting it would reasonably be expected to support the principle of the others, then there are in reality two or more amendments to be submitted, and the proposed amendment falls within the constitutional prohibition. Nor does the rule as stated unduly hamper the adoption of legitimate amendments to the Constitution. Such a document was presumably adopted deliberately, after careful preparation, as a harmonious and complete system of government. Changes suggested thereto should represent the free and mature judgment of the electors, so submitted that they cannot be constrained to adopt measures of which in reality they disapprove, in order to secure the enactment of others they earnestly desire. [Emphasis added]
In a later case, Hood v. State, 24 Ariz. App. 457, 539 P.2d 931, 938 (1975), the Arizona Court of Appeals upheld a proposed constitutional amendment, noting:
[T]here was a reasonable relationship among the provisions in this case and a voter could reasonably be expected to support all or none of the provisions contained within the single proposed amendment. [Emphasis added]
Also, see Tilson v. Mofford, 153 Ariz. 468, 737 P.2d 1367, 1371 (1987). In upholding a proposed tort reform amendment, the Court stated:
[A]s the purpose of each of the propositions in the proposed amendment is the same, (i.e., to regulate tort awards), voters reasonably can be expected to vote for or against the amendment as a whole. [Emphasis added]
In Amador Valley Joint Union H. School District v. State Board of Education, 22 Cal.3d 208, 149 Cal. Rptr. 239, 583 P.2d 1281 (1978), the California Supreme Court was faced with a challenge to a proposed amendment to that state's constitution by adding Article XIII(A), the "Jarvis-Gann" initiative. The proposed amendment first limited the tax rate on realty, second restricted the assessed value of realty, third limited the method of changes in state taxes, and fourth restricted authority of localities in assessment and levy of ad valorem taxes. Noting in approving the proposed amendment that it was wide ranging, the Court nevertheless observed:
[A]lthough petitioners insist that these four features constitute separate subjects, we find that each of them is reasonably interrelated and interdependent, forming an interlocking "package" deemed necessary by the initiative's framers to assure effective real property tax relief.
583 P.2d at 1290.
The Court found the proposal met the test, "that an initiative's provisions must be functionally related in furtherance of a common underlying purpose." [Emphasis added] 583 P.2d at 1290.
The California Supreme Court further pointed out that the first objective of the double amendment proscription: to avoid confusion and deception, had been satisfactorily answered. As to the second objective, the Court noted: "More importantly, no apparent "logrolling" is involved in this case." [Emphasis added]
*872 Thus the California test: are the provisions "functionally related," "reasonably interrelated," "interdependent," forming an "interlocking package" necessary to meet the basic reason for the amendment? And, most important, is there any apparent "logrolling"?
City of Coral Gables v. Gray, 154 Fla. 881, 19 So.2d 318 (1944), involved an interpretation of Florida's constitutional requirement that when more than one amendment was to be voted on: "The proposed amendments shall be so submitted as to enable the electors to vote on each amendment separately." Id. 19 So.2d at 320.
The proposed amendment authorized the reorganization of the assessment and levy of taxes in Orange (Tampa) and Dade (Miami) counties, making each county into a taxing unit. The proposed amendment also consolidated the prosecuting attorneys and criminal court clerks in those two counties. The Florida Supreme Court struck the amendment down, holding that requiring the voters to vote on both counties in the same amendment violated the constitution. The Court reasoned that while the voters might prefer the amendment for Dade County, they might at the same time oppose it for Orange County.
The Court stated:
[S]uccinctly stated, the rule announced in such states is to the effect that if a proposed amendment has but one main purpose and object in view and all else included therein is incidental thereto, and reasonably necessary to effectuate the main object and purpose contemplated, it is not susceptible to the charge that it contains more than one amendment. In order to constitute more than one amendment the propositions submitted must not only relate to more than one subject but must also have at least two separate and distinct purposes not dependent upon or connected with each other. And even though an amendment embrace more than one subject, said subjects need not be separately submitted to the electors, if they are so connected with or dependent upon the general subject that it might be undesirable that one be adopted and not the other. Moreover, the fact that an amendment may be capable of separation into two or more propositions concerning the value of which diversity of opinion might arise is not alone sufficient to condemn the proposed amendment; provided the propositions submitted may be logically viewed as having a natural relation and connection as component parts or aspects of a single dominant plan or scheme. Unity of object and plan is the universal test, and it is to be looked for in the ultimate end sought, not in the details or steps leading to the end. It is only when, in the light of common sense, several propositions are submitted as one and have to do with different subjects which are so essentially unrelated that their association is purely artificial, that they are not one within the constitutional mandate, for then the unity of object and purpose is not there, no matter in what form the proposal may be framed.
Id. 19 So.2d at 320.
In holding the proposed amendment invalid, the Court held:
[T]his is contrary to the manifest purpose of section 1 of Article XVII of the Florida Constitution, which is designed to require the submission of each amendment upon its merits alone and thereby secure by means of the ballot the free and independent expression of the will of the people thereon. By this constitutional requirement matters not in common, or those having no reasonable connection with each other, may not be consolidated. If it were otherwise, the elector would be put in the position where, in order to aid in carrying a proposition which he considered good or wise, he would be obliged to vote for another which he would otherwise reject as bad or foolish. It would sanction the practice of combining meritorious and vicious legislation in one proposal, so that the former could not be secured without submitting to the latter.
If such course could be pursued constitutionally there would seem to be no limitation, but conscience, on the extent *873 to which a three-fifths majority of a legislature might go in sending to the people proposed constitutional amendments the effect of which might well amount to the writing of a constitution binding upon one section of the State but not binding upon another, by the skillful wording of one single joint resolution... .
Id. 19 So.2d at 322.
In McBee v. Brady, 15 Idaho 761, 100 P. 97, 103 (1909), the Court stated:
The determination of whether a proposed change in the Constitution constitutes one or more amendments, it seems to us, depends upon whether the change as proposed relates to one subject and accomplishes a single purpose, and the true test should be, can the change or changes proposed be divided into subjects distinct and independent, and can any one of which be adopted without in any way being controlled, modified, or qualified by the other? If not, then there are as many amendments as there are distinct and independent subjects, and it matters not whether the proposed change affects one or many sections or articles of the Constitution. [Emphasis added]
The Montana Supreme Court in State ex rel. Teague v. Silver Bow County, 34 Mont. 426, 87 P. 450 (1906), held:
The fact that an amendment can be separated into two or more propositions concerning the value of which diversity of opinion may exist is not alone decisive. If, in the light of common sense, the propositions have to do with different subject, if they are so essentially unrelated that their association is artificial, they are not one; but if they may be logically viewed as parts or aspects of a single plan, then the constitutional requirement is met in their submission as one amendment. [Emphasis added]
Viewing HCR 41 "in the light of common sense" manifests it is dealing with two distinct things, two distinct subjects, with two distinct purposes. Keenan v. Price, 68 Idaho 423, 195 P.2d 662 (1948).
The last sentence of Article XIII, Sec. I, Par. I in Georgia's Constitution, states:
When more than one amendment is submitted at the same time, they shall be so submitted as to enable the electors to vote on each amendment separately.
In Carter v. Burson, 230 Ga. 511, 198 S.E.2d 151 (1973), the Georgia Supreme Court, in analyzing the section, held:
The test of whether an Act or a constitutional amendment violates the multiple subject matter rule is whether all of the parts of the Act or of the constitutional amendment are germane to the accomplishment of a single objective. [Emphasis added]
* * * * * *
Each proposition submitted to the voters should stand or fall upon its own merits, without, on the one hand, receiving any adventitious aid from another and perhaps more popular one, or, on the other hand, having to carry the burden of supporting a less meritorious and popular measure. No voter should be compelled, in order to support a measure which he favors, to vote also for a wholly different one which his judgment disapproves, or, in order to vote against the proposition which he desires to defeat, to vote also against that one which commends itself to the approval of his judgment. When he is thus compelled, if he votes at all, there is something closely akin to coercion when his ballot is cast.
198 S.E.2d at 156.
16 C.J.S. Constitutional Laws, ง 7(b); 9(b)(3) and cases cited; 94 A.L.R. 1502.
HCR 41 proposes two basic amendments to ง 112. The first is to provide for the classification of all property in Mississippi into one of five classes, and place a percentage of value at which each class may be assessed. The basic purpose of this particular amendment is to provide a systematic method by which all property in Mississippi may be lawfully assessed for taxation.
HCR 41 then adds to this basic purpose another distinct objective:

*874 1. Totally remove from Claiborne County all lawful authority to levy any tax upon, or to demand any tax revenue from the nuclear plant.
2. Totally remove the plant from any Constitutional mandate or guide as to the percentage of value it will be assessed. This is to be determined solely by Legislative enactment.
3. Constitutionally grant the Legislature the unrestricted power to determine the amount and public purpose of the tax levy.[7]
4. Constitutionally grant the Legislature the sole authority to determine the distribution of all tax revenue from the plant.
Clearly the first purpose is to remove the requirement of the original ง 112 that all property be assessed in proportion to its true value, and to substitute instead five classes, each of which is assessed at a certain percentage of its true value.
The second purpose is to pluck the nuclear power plant out of the overall plan and design of assessment, and remove it to a special, separate, unique category never existing heretofore. It is not simply to authorize a unique assessment, either, but to also authorize a unique manner of taxing and distributing all tax revenue from it. HCR 41 itself creates in this plant a special, separate subject.
This second purpose is to take away from Claiborne County the authority to levy any tax upon, or demand any tax revenue from the nuclear plant, and make the (1) assessment value, (2) the tax levy upon, and (3) distribution of tax revenue from the plant a matter of Legislative enactment. Put simply, this second purpose is for the state to decide (1) how much the plant is to be assessed, (2) to collect all tax money from the plant, and (3) distribute it, all as the Legislature by statute provides. It will be the state which gets all the tax money from the plant, and the state deciding how it will be distributed, with no Constitutional limitation. Claiborne County will have nothing to do with it.
To contend the second purpose and object is part and parcel of the first defies reason and common sense.
Very simply, the two propositions could have been submitted separately, and the people could have voted on each, voting "yes" or "no" as to either without affecting the other.

THE MISSISSIPPI CASES
Four decisions by this Court have analyzed the prohibition of more than one amendment by single vote of ง 273.
State ex rel. McClurg v. Powell, 77 Miss. 543, 27 So. 927 (1900), involved a proposed amendment making the judiciary elective. By the Constitution of 1890 all Supreme Court judges, and all circuit judges and chancellors were appointive. Section 145 dealt with the appointment of the Supreme Court judges, Section 149 their terms of office, and Section 152 appointment of a Supreme Court Judge when a vacancy occurred in office. Section 153 provided all circuit judges and chancellors were appointed by the governor to four-year terms of office.
The proposed amendment struck all these sections and provided that all Supreme Court judges, circuit court judges and chancellors were to be elected for eight- and four-year terms, respectively, and were to be elected as other elective state officers. It also provided the legislature would provide by law for party nominations of the circuit judges and chancellors by districts.
The proposed amendment was ratified by the people in November, 1899. Judge Powell, appointed by the governor as circuit judge in 1900, refused to vacate his office, and filed this action in circuit court challenging the constitutionality of the amendment.
It can be readily seen that one general purpose was sought by the proposed *875 amendment: to make all trial and supreme court judges elective rather than appointive, and for their election to be held as other elective officers. It could certainly be argued that a voter would wish to treat all judicial officers the same, and whether he favored elective or appointive, he would prefer that all be alike. There was a manifest absence of logrolling. The voter was not required to take a dose of castor oil in order to get his candy. It was a far cry from HCR 41.
This Court nevertheless held the proposed amendment violated ง 273. In our application of the State v. Timme, supra, and the general criteria for determining whether a proposed amendment contained disparate amendments, State ex rel. McClurg, supra, we also stated:
A voter might have chosen to vote for the election of circuit judges and not for the election of chancellors; and one may have chosen to vote for the election of both circuit judges and chancellors, and yet, not for the election of supreme court judges; one might have been willing to vote for the election of all judges, and yet not willing to sanction, by his vote, a scheme for party nomination by districts, for judges to be voted for by electors of the entire state, such as proposed in these amendments.
77 Miss. at 572, 27 So. 930-31.
Fourteen years later, in State ex rel. Collins v. Jones, 106 Miss. 522, 64 So. 241 (1914), this Court had before it a challenge of the validity of an amendment to ง 153 making the offices of circuit judge and chancellor elective rather than appointive. We held the amendment did not violate ง 273, and that the test applied in State ex rel. McClurg v. Powell, supra, was "too narrow,":
[I]n many cases matters which might stand alone may, it would seem, properly be embodied in the same amendment if they related to the same subject and are designed to accomplish the same purpose. [Emphasis added]
64 So. at 249.
We further noted that electing judges by popular vote was of this character, although it would be possible to provide for their election by separate amendment, and that rules for the nomination and then election was merely incidental to this purpose.
As to this constitutional restriction, this Court noted courts generally "have ordinarily taken a liberal and common sense view." 64 So. at 249.
We then quoted with approval language from Courts from other jurisdictions:
[C]ertainly no good could result from a separate submission which is not equally as well and better accomplished by submitting them together as one amendment; and the separate submission might result in the absurdity of the ratification of one and the rejection of the other... . In order to constitute more than one amendment, the proposition submitted must relate to more than one subject, and have at least two distinct and separate purposes not dependent upon or connected with the other. [Emphasis added]
* * * * * *
[I]f the amendment has but one object and purpose, and all else included therein is incident thereto, and reasonably necessary to effect the object and purpose contemplated, it is not inimical to the charge of containing more than one amendment.
64 So. 249.
Again it is obvious the facts in State v. Jones, supra, were a far cry from HCR 41.
Two of our subsequent decisions dealt with ง 273, both involving an amendment to Article IV, ง 33:
Section 33. The legislative power of this state shall be vested in the legislature, which shall consist of a senate and a house of representatives.
Chapter 520, Laws of 1941, submitted to the people a proposed amendment to ง 33. The first paragraph of the proposed amendment read:
Section 33. The legislative authority of this state shall be vested in a legislature which shall consist of a senate and a house of representatives, but the people reserve to themselves the power to propose *876 legislative measures, laws, resolutions and amendments to the constitution, and to enact or reject the same at the polls independent of the legislature; and also reserve the power, at their own option to approve or reject at the polls any act, item, section or any part of any act or measure passed by the legislature.
Paragraph 1 following provided that the first power reserved by the people was the initiative, and by a petition of not more than 7,500 voters any measure could be proposed. Paragraph 2 provided that the second power reserved by the people was the referendum, and by a petition of not more than 6,000 voters a referendum could be held on measures passed by the legislature. Paragraph 3 for putting into effect an emergency measure adopted by the legislature.
The first portion of Paragraph 4 read:
4. The word `measure' as used herein means any law, bill, resolution, constitutional amendment, or any other legislative measure. All elections on general, local and special measures referred to the people of the state shall be held at the general state or congressional elections, except when the legislature shall order a special election. Any measure submitted to the people, as herein provided, shall take effect and become law when approved by a majority of the votes cast thereon, and not otherwise. Such measure shall be in operation on and after the thirtieth day after the election at which it is approved. The veto power of the governor shall not extend to measures initiated by or referred to the people.
This paragraph then provided how the elections would be conducted, how petitions could be challenged, and the filing mechanism with the secretary of state.
The proposed amendment was ratified by the electorate on November 3, 1914, and inserted into our Constitution by the legislature at the 1916 session, Chapter 159, Laws of 1916, known as the Initiative and Referendum Amendment.
The validity of this amendment was challenged in State ex rel. Howie v. Brantley, 113 Miss. 786, 74 So. 662 (1917). This Court noted the objection to the 1914 amendment:
The ground of this objection is that the amendment reserves to the people three separate and distinct powers, each of which could have been the subject of a separate amendment: First, power to adopt a statute upon their own initiative; second, power to annul a statute enacted by the Legislature; and, third, power to amend the Constitution upon their own initiative.
Noting first a requirement that there be a "unity of object ... in the ultimate end," and if in the "light of common sense" the propositions were not "so unrelated that their association be artificial," the majority opinion responded to the objection:
Returning, now, to the amendment under consideration, it seems clear from an inspection thereof that the three propositions contained in it are, ... but `parts of one general plan or scheme looking to a more direct control of legislation' (or of the laws, both constitutional and statutory, by which they are to be governed) `by the people.' This purpose can be partially accomplished by the adoption of any one of the three propositions, but can be accomplished in full only by the adoption of all of them.
Two vigorous dissents argued that the 1914 amendment by authorizing the people to initiate an amendment to the Constitution as well as statutes clearly embraced more than one subject, and amended not only ง 33 but ง 273 as well.
Both the majority and dissents used the test of State v. Jones, supra, but came to opposite conclusions.
The last case addressing the 1914 Initiative and Referendum Amendment was Power v. Robertson, 130 Miss. 188, 93 So. 769 (1922), in which we expressly overruled Howie v. Brantley, supra.
The majority opinion held that the 1914 amendment violated ง 273, noting that by reserving to the people the right to participate in legislation, as well as to amend the Constitution, it imposed many restraints *877 upon legislative power, and materially changed many sections of the Constitution. It further gave the people the right, by a small percentage of voters, to suspend laws by filing a petition within 90 days after adjournment of the legislature. It removed the veto power of the governor. Thus, not only ง 33, but งง 72 and 273 were materially changed. The opinion finally noted there were several Constitutional proscriptions of the legislature's authority to enact certain types of laws, not proscribed to voters under the Initiative and Referendum Amendment. The opinion concluded with the observation that the Court's holding in State ex rel. Collins v. Jones, supra, was neither affected nor modified by this case.
The Court in Power v. Robertson, supra, did not deal with any "unity of object" criterion, or whether there was an "artificial" association of propositions to be voted on, finding instead the 1914 amendment fatally flawed because it materially changed several sections of the Constitution, thus literally violating the ง 273 proscription:
[A]nd if more than one amendment shall be submitted at one time, they shall be submitted in such manner and form that the people may vote for or against each amendment separately.
It would appear the Initiative and Referendum Amendment clearly passed the "unity of object" test. There was but one single purpose: to give the people the right by signed petition to have a state election on whether a law should be adopted, a statute should be rejected, or whether there should be a certain amendment to the Constitution. This amendment in all likelihood would have passed the test of Amador Valley Joint Union H. School District v. State Board of Education, supra. All parts of the proposed amendment were functionally related, and all parts were an interdependent, interlocking package. Instead, this Court in Power v. Robertson, supra, rejected the amendment using a "locational" test, holding that it amended several sections of the Constitution. Such Initiative and Referendum Amendments have been approved by the courts of other states as not violative of the two-subject prohibition. State ex el. Hay v. Alderson, 49 Mont. 387, 142 P. 210 (1914); Gottstein v. Lister, 88 Wash. 462, 153 P. 595 (1915). In my view the Initiative and Referendum Amendment did not violate ง 273 as then written.

1958 AMENDMENT TO ง 273
The majority fails to probe the basic reason for the prohibition in state constitutions against requiring a single vote on more than one amendment, namely: to prevent logrolling. Indeed, the word is not mentioned in the opinion.
Significantly and commendably, however, the majority recognizes HCR 41 does contain disparate purposes and that under our decisions interpreting the original ง 273 it would have been held to violate that section. Without using the term, the majority recognizes this as a case of logrolling. Majority opinion, pp. 857-858.
It is the majority's conclusion that under the 1958 amendment to ง 273 the embracing of two disparate, unrelated purposes in the same proposed amendment to the Constitution is not prohibited, and it does not matter that HCR 41 does this very thing.
My conclusion is exactly opposite. In my view the present ง 273 in no way diminishes the prohibition against logrolling. I will give the reasons for my view, and then the reasons I have concluded the majority is wrong.
Chapter 629, Laws 1958, submitted a proposed amendment to ง 273, ratified by the electorate August 26, 1958, and inserted into the Constitution by Chapter 78, Laws 1959 Ex.Sess. The pertinent amended portion reads:
[A]nd if more than one amendment shall be submitted at one time, they shall be submitted in such manner and form that the people may vote for or against each amendment separately; and notwithstanding the division of the Constitution into sections, the Legislature may provide in its resolution for one or more amendments pertaining and relating to the same subject or subject matter, and *878 may provide for one or more amendments to an article of the Constitution pertaining and relating to the same subject or subject matter, which may be included in and voted on as one amendment.[8]
Before analyzing the portion of the present ง 273 above quoted, let us first take a look at the original and the present ง 273 which are set forth in their entirety in Appendix G. Such examination reveals a clear purpose of the 1958 amendment to ง 273 to make it mechanically, or procedurally easier for the people to have an election on whether or not to amend our Constitution. This is obvious. Serious hurdles to the legislative and voting process were either reduced or removed altogether.[9]
In doing so, however, the people clearly did not mean to make it easier to conduct a fraudulent election. The amendment was designed to make it easier to have a fair and honest election, expressing the free will of the people, and not to make it easier to call an unfair election, as the majority has concluded.
I respectfully remind my colleagues that it is just as cheap and just as inexpensive to permit the people to vote separately on two proposed amendments in the same election as it is to require them to cast but one vote on them. It would have been just as cheap, and just as simple to have provided under HCR 41 for the people to vote on the nuclear power plant separately. It would have cost no more, and much more important, the election would have been fair.
This sends up in smoke any argument that facilitating the evil of logrolling is somehow a requisite or consequential part of any overall plan to make it easier to amend a Constitution.
This Court's approval of logrolling can never make it easier to cheaper to conduct an honest election to amend the Constitution. It will only make it easier, in fact no problem at all, to conduct an unfair, fraudulent election.
What does the above-quoted portion of the present ง 273 mean? It provides first:
[A]nd if more than one amendment shall be submitted at one time, they shall be submitted in such manner and form that the people may vote for or against each amendment separately; ...
This is the identical language of the original, and obviously means something.
Next:
[A]nd, notwithstanding the division of the Constitution into sections, the Legislature may provide in its resolution for one or more amendments pertaining *879 and relating to the same subject or subject matter... which may be included in and voted on as one amendment.
To me this means that it does not matter that more than one section of the Constitution is amended so long as it pertains and relates to the same subject or subject matter. And, the "same subject or subject matter" means just what courts have consistently interpreted "one subject" or the "same subject" to mean, namely: that the propositions to be voted on are related and dependent on each other, so that the amendment should either be passed or defeated in its entirety. If they are disparate, unrelated, then by all common sense they are indeed different subjects.
And finally:
[A]nd may provide for one or more amendments to an article of the Constitution pertaining and relating to the same subject matter, which may be included in and voted on as one amendment.
This means the same thing. It does not matter if an entire article of the Constitution is to be amended, this is all permissible if it pertains and is related to the same subject or subject matter.
It is clear to me that the above-quoted portion of the present ง 273 was inserted to meet the "locational" objection which this Court raised in Power v. Robertson, supra, when many sections of the Constitution were implicated in a proposed amendment. The "functional" test of what is and what is not a single subject, or the "same subject" as Courts have always interpreted the term, remains intact.
The functional test of whether a proposal contains more than one subject is not whether the propositions in the proposed amendment can somehow be embraced under one general subject. Such a test would be meaningless. Instead, the functional test consistently applied by courts is a practical, common sense examination: do the propositions have two disparate purposes, and each capable of being voted on without affecting the other, or are the propositions so related and interdependent that the entire package should be passed or defeated in its entirety? If the first, then courts have held the proposal to contain more than "one subject," and therefore two amendments, requiring a separate vote on each; and if the latter, then the proposal has been held to contain but "one subject," and a single amendment requiring only one vote. By this interpretation the courts give full faith and credit to the spirit of constitutional provisions such as addressed here: to prevent logrolling. Kerby v. Luhrs, supra; State v. Timme, supra; State v. Silver Bow County, supra; City of Coral Gables v. Gray, supra; Moore v. Brown, 350 Mo. 256, 165 S.W.2d 657, 662 (1942); People v. Sours, 31 Colo. 369, 74 P. 167 (1903); 16 Am.Jur.2d Constitutional Law, 348, p. 366, and cases cited, note 33.
There is nothing to remotely suggest that the people in 1958 proposed to ratify an amendment that would sanction logrolling.
The majority's interpretation of this 1958 amendment will add gray to the hair of the elder statesmen still living who sponsored it, and cause stirring in the graves of those of them who have passed beyond.

THE MAJORITY VIEW
A few preliminary observations are in order before undertaking the ambitious task of analyzing the majority's reasoning.
This decade will present no more important or far-reaching case before us. Make no mistake about it. We are doing something drastic. The majority has blithely removed forever any protection whatever against the evil of logrolling, which is the purpose of constitutional provisions such as contained in ง 273 in the first place.
Now, one would assume that with cases numbering in at least the hundreds saying that the very purpose of constitutional provisions such as ง 273 is to prevent logrolling, a purpose which the majority is forsaking forever, that the majority would at least favor us with some respectable authority for scuttling this ship.
How many cases does the majority cite for its conclusion? One. State v. Jones, 106 Miss. 522, 64 So. 241 (1914), p. 857, majority opinion. Some readers may be *880 bothered how that case could be much of an authority. State v. Jones, supra, was interpreting the original ง 273, and was decided 45 years prior to the 1958 amendment by a Court which never saw, never heard of, and probably never dreamed of the 1958 amendment. How that Court's interpretation of the original ง 273 should somehow bind this Court's interpretation of the current section escapes me.[10]
How in the world can the majority assert that because the Court in State v. Jones, supra, read the original ง 273 a certain way, that it would read the present ง 273 the way the majority has so remarkably concluded?
I suppose the majority can guess. It can even assume some clairvoyance. It can even assume some clairvoyance over the dead. Judicial spiritualism.
The anomaly does not end here. The majority opinion in State v. Jones, supra, runs on for 17 full pages of fine print in the Southern Reporter. The majority has taken one sentence from that opinion and rested its case.
And that one sentence is part of a lengthy quote from an opinion of another court. And besides all this, the majority has unfortunately misread its sole authority. Taking a sentence out of context can entail a risk when there is a rebuttal.
As noted, State v. Jones, supra, involved an amendment to ง 153 so as to make the offices of circuit and chancery judges elective rather than appointive. Clearly there was a single purpose embraced in this amendment, to make these trial judges' offices elective, and there was no reason to separate the two, the package should have either been passed or defeated in its entirety, all of which this Court found. Even if there had been a provision for a separate vote by the people on each office, it is inconceivable that the vote on them both would not have been essentially the same.
Quoting from the majority (p. 857, majority opinion):
Instead, the Court (State v. Jones) stated, as the proper test that:
In order to constitute more than one amendment, the proposition submitted must relate to more than one subject and have at least two distinct and separate purposes not dependent upon or connected with each other.

Id. at 545, 64 So. at 243. Upon this basis, and under this more liberal test, the Court found but one "purpose" and "subject" in the proposed amendment.

Jones is our pre-1959 case most consistent in principle with modern Section 273. Indeed, the 1959 amendment to Section 273 may be read as having incorporated the "same subject" test applied by this Court in Jones, supra, and adding an additional "same subject matter" test. The new Section 273 language, however, does not include the "two distinct and separate purposes" part of the Jones formulation. This is significant in that two amendments may be motivated each by a distinct and separate purpose but may yet pertain to and relate to the same subject or subject matter. Current Section 273 thus required a broader than Jones reading, a proposition this day of dispositive power.
The majority then tells us that the nuclear power plant is part of the subject of ad valorem taxation, and therefore is the same subject as the rest of HCR 41. The majority goes on to recognize that the nuclear power plant and rest of HCR 41 do indeed contain disparate purposes. Yet this does not matter.
None of this is of consequence today, for the distinct and separate purposes part *881 of the Jones formulation was not carried forward into post-1959 Section 273.
P. 857, majority opinion.
The majority recognizes there is no judicial protection against logrolling when it proceeds to tell us that the "citizen has some indirect protection against the political ploy of lumping together controversial and attractive amendments, although there is no legal mandate for such." [Emphasis added] (p. 857, majority opinion) The majority's consoling advice is that he can talk to his legislator, even though he cannot go to court.
Thus the only limitation the majority places on any proposed amendment is that it contain but the same subject or the same subject matter, which is no assistance whatever. The majority gives no rule of interpretation, no guide or clue, as to what is and what is not the same subject matter. We do know the majority considers the fact that the multiple propositions have totally different purposes and unrelated objectives is not a factor to be considered.
The "same subject matter" is left to whatever some judge thinks it means. And, if a judge is free to define in each case the perimeter of the subject or the subject matter the horizon is infinite. Execution in the state gas chamber and a town board meeting can be part of the same subject matter of state government. The majority's conclusion that the HCR 41 plan for the nuclear power plant and the reassessment of all property in this state are the same subject makes about the same sense.
Thus "same subject" or "same subject matter" are reduced to meaningless words. Under the majority's reasoning, the two-amendment prohibition might as well have been repealed completely.
Thus has the majority concluded that State v. Jones, supra, set up a simple, all-determinative two-prong test to determine whether or not a proposed amendment violates ง 273: if you have (1) more than one subject, and (2) at least two distinct and separate and independent purposes, then you have a violation. On the other hand, if you have but one of the two, then there is no violation. And, since (2) no longer applies under the present ง 273, you only look to (1). And (1), as above seen, is meaningless.
True, courts have consistently held that if you have propositions containing more than one subject which also have separate, disparate purposes, you have two amendments in violation of the constitution.
The converse is not correct, however, as the majority has assumed, that you can have propositions containing two separate, unrelated purposes which at the same time do not also violate the one-subject rule, and constitute two amendments under the constitutional prohibition.[11]
Also, if the proposal does indeed contain propositions embracing several purposes, if they together constitute one harmonious, integrated whole, then the proposal is deemed by the courts to contain but one subject, and one amendment, which will pass constitutional muster. In other words, whether the purposes are disparate or interdependent is the determining factor in the courts' reasoning as to whether there is one or more subjects.
This conclusion is inescapable from any reading of State v. Timme, supra, and its progeny, including State v. Jones, supra.
One may correctly say, unless you have a four-legged animal which also barks "bow-wow," you will not have a dog. This is not saying, however, that you can have a critter which barks "bow-wow" that is not both a four-legged animal and a dog.
State v. Jones, 64 So. at 243, quoted at length from State v. Timme, supra, and it is the sentence from that case from which the majority has taken its text. State v. Timme, supra, involved a constitutional amendment changing legislative sessions from annual to biennial, how the legislators were to be elected and their terms of office, and their salary. The objection was *882 that the amendment in fact embraced four amendments, four subjects, each of which should have been submitted and voted upon separately. The Wisconsin Court was of a different view, and held that each separate provision was "promotive of the same object and necessary to the perfection and practical usefulness thereof," and "Certainly they should either both be defeated or both adopted," and "no good could result from a separate submission." 11 N.W. at 790.
The Wisconsin Court also held in language, quoted in State v. Jones, supra, the following:
We think amendments to the constitution, which the section above quoted requires shall be submitted separately, must be construed to mean amendments which have different objects and purposes in view. In order to constitute more than one amendment, the propositions submitted must relate to more than one subject, and have at least two distinct and separate purposes not dependent upon or connected with each other. [Sentence quoted by majority]
The quote then continued at some length, but I shall only set forth the conclusion:
[T]he Legislature has a discretion within the limits above suggested, of determining what shall be submitted as a single amendment, and ... they are not compelled to submit as separate amendments the separate propositions necessary to accomplish a single purpose. [Emphasis added]
State v. Jones, 64 So. at 243; State v. Timme, 11 N.W. at 791. Virtually all reasoning of State v. Jones, supra, is contained in its lengthy quotes from other courts' decisions.
It is thus clear that much more is involved in the test than the simplistic analysis made by the majority.[12]
That courts, when they decide whether a proposal indeed contains more than one "subject" do not look to an abstract definition of whether the proposal can all be embraced under some general definition, but instead think in the very practical sense of whether there is but one, single harmonious objective embraced in the proposal, is clearly demonstrated in Moore v. Brown, supra. Section 2 of Article XV of the Missouri Constitution reads:
No proposed amendment shall contain more than one amended and revised article of this Constitution or one new article which shall not contain more than one subject and matters properly connected therewith.
The Missouri Supreme Court stated:
The general rule is that one constitutional amendment may change several articles or sections of a Constitution if all these changes are germane to a single controlling purpose. In such case it does not contain two amendments or two subjects, and cannot be said to violate Sec. 2, Article XV for that reason... . The theory is that the people ought not to be required to vote on two or more separate propositions as one, so that they must either accept or reject both; also that such a course permits logrolling. [Emphasis added]
165 S.W.2d at 662.
This same point is also demonstrated in In re: Initiative Petition No. 314, 625 *883 P.2d 595 (Okla. 1980). Article 24, ง 1 of that state's constitution in pertinent part reads:
No proposal for the amendment or alteration of this Constitution which is submitted to the voters shall embrace more than one general subject and the voters shall vote separately for or against each proposal submitted; provided, however, that in the submission of proposals for the amendment of this Constitution by articles, which embrace one general subject, each proposed article shall be deemed a single proposal or proposition. [Emphasis added]
625 P.2d at 600.
In striking down a proposed amendment to the portion of the state constitution dealing with intoxicating liquors, the Court noted:
To understand any series of cases on any rule of law, one must look at the underlying purpose behind the rule. The underlying purposes of the single-subject rule has been set out many times... . [Emphasis added]
625 P.2d at 603.
Then, by examination of and quoting from decisions of other Courts (Fugina v. Donavan, supra; Kerby v. Luhrs, supra; Amador Valley Joint Union H. School District v. State Board of Equalization, supra), the Oklahoma Supreme Court found that a major purpose of confining an amendment to a single subject was to prevent logrolling.
The Court held:
It is clear from the decisions that no matter how the courts characterize the test they apply, they examine the inherent nature of the provisions to determine whether they are subjects which are separate and independent from each other so that each could stand alone, or fall as a whole, leaving the constitutional scheme harmonious and independent on that subject. [Emphasis added]
And,
[I]n analyzing the amendment in light of the purposes underlying the single subject restriction, we find that it is misleading to the voters and borrowing from Kerby, it is "logrolling of the worst type." [Emphasis added]
625 P.2d at 607.
It can thus be seen that the Timme court (as its progeny have done so) recognized that whether something was or was not the same subject or the same subject matter could be interpreted in opposite directions. In our case the majority has chosen to interpret "same subject" quite broadly. On the other hand, lawyers in challenging a proposed amendment, if it by any definition could embrace more than one subject, would contend that it contained multiple subjects, and therefore more than one amendment, thus violating their state's constitution. This is precisely what the contestants argued in Timme. As a consequence, the court recognized that a "single subject" argument furnished no criterion; it is too general and can be argued in a multitude of ways. What the court was looking for was whether the propositions were unrelated and not germane to each other. Taken in context with the remainder of the opinion, it is clear to me that this is what the Court was saying in this sentence: "You may very well be able to make a creditable argument that the proposal contains more than one subject by your definition, but that is not what counts. We are looking for whether the proposal in fact has distinct and unrelated purposes so that each could be voted on separately without affecting the other." The aim of the courts has been to prevent logrolling, not meet some abstract definition.
I close my case with what I shall term the Florida experience. It is a close parallel to this state.
As above noted, p. 871, supra, the Florida Constitution of 1885 required that when more than one constitutional amendment was being submitted, they should be submitted so as to enable the electors to vote on them separately. In interpreting this section, the decision in City of Coral Gables v. Gray, supra, at pp. 871-872, has the following sentence:
In order to constitute more than one amendment the propositions submitted *884 must not only relate to more than one subject but must also have at least two separate and distinct purposes not dependent upon or connected with each other.
The Florida Supreme Court nevertheless struck down a proposed amendment to reorganize the county governments of the two most populated counties in the state because it involved separate counties. While the amendment embraced but one general subject, the court found two separate purposes in creating a special system of taxation for the two counties.
In 1968 the state of Florida adopted a new Constitution. Article XI of that constitution is broad sweeping, encompassing methods whereby it may be amended, revised or a constitutional convention called by a petition of the people. Of significance is that state's experience with Section 3 of Article XI. It read:
ง 3. Initiative
The power to propose amendments to any section of this constitution by initiative is reserved to the people. It may be invoked by filing with the secretary of state a petition containing a copy of the proposed amendment, signed by a number of electors in each of one half of the congressional districts of the state, and of the state as a whole, equal to eight per cent of the votes cast in each of such districts respectively and in the state as a whole in the last preceding election in which presidential electors were chosen. [Emphasis added]
In the case of Adams v. Gunter, 238 So.2d 824 (Fla. 1970), the Florida Supreme Court was faced with a petition under ง 3 to call an election to change the Florida legislature from bicameral to unicameral. The Court held that because the proposed amendment in fact would amend many sections of the Florida Constitution, the proposed amendment via ง 3 was unconstitutional. (Shades of Power v. Robertson, supra.)
No doubt in response to this decision, the people of Florida in the general election on November 7, 1972, amended the first sentence of ง 3 to read as follows:
ง 3. Initiative
The power to propose the revision or amendment of any portion or portions of this constitution by initiative is reserved to the people, provided that, any such revisions or amendment shall embrace but one subject and matter directly connected therewith. [The remainder of the amended section is the same as the original.] [Emphasis added]
I ask the reader to please note that Florida's 1968 ง 3 contained no statement whatever about "one subject," just as our original ง 273 does not mention the word "subject." The 1972 amended ง 3 permits a change of "portions" of the Constitution in one amendment provided it embraces "but one subject and matter directly connected therewith." Our present ง 273 requires that more than one amendment be "pertaining and relating to the same subject or subject matter." One would be exceedingly hard put to discern any difference between the message in Florida's present ง 3 and our 1958 amended ง 273.
In Weber v. Smathers, 338 So.2d 819 (Fla. 1976), the Florida Supreme Court examined an amendment to the constitution instituting certain ethics in government, requiring public officials to make financial disclosures, limiting lobbying, and providing for civil penalties. The Court held that the provisions in the amendment were sufficiently related to withstand an attack that they embraced more than one subject. In his concurring opinion Justice England noted:
From this I conclude that the "one subject" limitation was selected to place a functional, as opposed to a locational, restraint on the range of authorized amendments.
338 So.2d at 823.
In Floridians Against Casino Takeover v. Let's Help, 363 So.2d 337 (Fla. 1978), the Court examined a proposed amendment authorizing casino gambling in two counties, with the taxes to go to "the several counties, school districts and municipalities for the support and maintenance of the free public schools and local law enforcement." 363 So.2d at 338. Finding it passed constitutional *885 muster, the Court held that just as the amendment in Weber v. Smathers, was within the ambit of a single subject:
[S]o is the generation and collection of taxes, and the distribution thereof, part and parcel of the single subject of casino gambling ... the various elements serve to flesh out and implement the initiative proposal, thereby forging an integrated and unified whole. [Emphasis added]
In following Weber v. Smathers, supra, the Court held that the one-subject limitation should be viewed broadly rather than narrowly, and it did not matter how many constitutional sections were in fact amended by the proposal, so long as it met the functional test.
Justice Alderman of that Court registered a strong dissent. While conceding that the people had every right to amend their Constitution, he wrote:
The amendment presently under consideration, in my opinion, is not lawful because the allocation of tax revenue is separate from and not directly connected to the subject of casino gambling. The proposed amendment in its present form is a blatant attempt at "logrolling," or as appellants say in their brief, it is "a sugar coated pill to attempt to persuade those Floridians not living in Dade and South Broward Counties to vote for casino gambling on the theory that they may receive some benefit therefrom but none of the detriments brought about by casino gambling.
The majority view the one subject limitation broadly and says that they have applied a "pragmatic and common sense philosophy" in concluding that the proposed amendment possesses the requisite functional unity to pass muster. This view, in my opinion, so dilutes the one subject limitation of Article XI, Section 3, that there is practically no limitation on the scope of an amendment proposed by the initiative process. I fear that what they have done is to "pragmatize" and "common sense" the one subject limitation right out of the constitution. I do not think this is what was intended by the people when they placed this limitation in the constitution.
363 So.2d at 343.
In any event, whether the one-subject limitation were viewed broadly or narrowly, one does not have to wonder what the Florida Supreme Court would have held if the casino proposition had been placed with a proposition to reassess all taxable property in Florida. Yet, even that would not have been anything nearly as egregious a case of logrolling as HCR 41.
In Fine v. Firestone, 448 So.2d 984 (Fla. 1984), the Court receded from its position in Floridians, supra, holding, that whether or not more than one section were in fact going to be amended by the proposal was a factor to be considered whether the one-subject limitation was being violated. The Court then in unmistakable language gave the meaning and purpose of the one-subject limitation, not set forth in the two previous decisions: "The single-subject requirement in the provision language of this section is a rule of restraint."[13] 448 So.2d at 988.
The single-subject requirement in article XI, section 3, mandates that the electorate's attention be directed to a change regarding one specific subject of government to protect against multiple precipitous changes in our state constitution. This requirement avoids voters having to accept part of an initiative proposal which they oppose in order to obtain a change in the constitution which they support.
448 So.2d at 989.
In this case the Court held that a proposed amendment placing a limitation upon the taxing authorities power to assess and levy ad valorem taxes and service fees for government-owned utilities violated the one-subject limitation of Section 3, concluding:
If the purpose of the single subject requirement means anything, it must apply *886 in this instance. The purpose of the single subject requirement is to allow the citizens to vote on singular changes in our government that are identified in the proposal and to avoid voters having to accept part of a proposal which they oppose in order to obtain a change which they support. The single-subject rule of restraint is a provision "which the people themselves have incorporated in our Constitution to protect it against precipitous and spasmodic changes in the organic law."
448 So.2d at 993.
Justice McDonald in a concurring opinion wrote:
Combining multiple propositions into one proposal constitutes `logrolling,' which if our judicial responsibility is to mean anything, we cannot permit it.
448 So.2d at 995.
Justice Ehrlich, in concurring, wrote:
As the majority notes, the purpose of the single-subject requirement is to prevent logrolling, pairing a popular measure with an unpopular one in order to enhance the likelihood of passing the lessfavored measure. [Emphasis added]
448 So.2d at 995-96.
In another special concurring opinion, Justice Shaw criticized the broad interpretation of the one-subject limitation, and wrote:
I see the one-subject limitation on initiative petitions as serving two purposes:
1. Ensuring that initiatives are sufficiently clear so that the reader, whether layman or judge, can understand what it purports to do and perceive its limits.
2. Ensuring that there is a logical and natural unity of purpose in the initiative so that a vote for or against the initiative is an unequivocal expression of approval or disapproval of the entire initiative. [Emphasis added]
448 So.2d at 998.
In Evans v. Firestone, 457 So.2d 1351 (Fla. 1984), the Court held unconstitutional a proposed amendment to change the common law on joint tortfeasor liability, limit damages for pain and suffering, and grant summary judgment power to the trial courts. The Court found the proposal dealt with two different functions of government, legislative and judicial, and violated the one-subject limitation.

Fine stands for the axiomatic proposition that enfolding disparate subjects with the cloak of a broad generality does not satisfy the single subject requirement.
457 So.2d at 1351.
While logrolling was not a feature of this case, the Court again took pains in the majority and special concurring opinions to reiterate that the purpose of the single-subject limitation was to prevent logrolling. 457 So.2d at 1354, 457 So.2d at 1357, 457 So.2d at 1360. See also Carroll v. Firestone, 497 So.2d 1204 (Fla. 1986); In re: Advisory Opin. to Atty. Gen. English, 520 So.2d 11 (Fla. 1988).
In summary, the 1885 Florida Constitution had a requirement that if more than one proposed amendment was being voted upon, they would be submitted separately. The Florida Supreme Court in City of Coral Gables v. Gray, supra, interpreted this section as all similar sections in state constitutions were interpreted by our state courts. It even used the same sentence used in State v. Timme, supra, and State v. Jones, supra. In 1972 the Florida Constitution was amended authorizing an amendment to "portion or portions" of the Constitution provided only that the amendment embraced "but one subject and matter directly connected therewith."
One fact is abundantly clear from the Florida experience. It was the intent of the people of Florida in 1972 to greatly broaden the amendment process. Section 3 of Article XI was changed from authorizing an amendment to "any section" to "any portion or portions of the constitution."
Yet it never occurred to the Florida Supreme Court to put an interpretation on this amendment that the majority has put upon our present ง 273.
It never occurred to the Florida Supreme Court that the people of that state wanted to permit logrolling in constitutional amendments.
*887 In repeated decisions the Florida Supreme Court has interpreted their "one subject" limitation as a people-imposed rule of restraint against logrolling. The majority interprets our present ง 273 as removing all brakes from logrolling.
Which Court is serving the people better?

HB 388 UNDER SCR 519 โ

THE 1982 AMENDMENT TO ง 112
The question of whether HB 388 is a valid statute under SCR 519, Chapter 622, Laws of 1982, which was ratified by the people November 2, 1982, is not addressed by the majority.[14] Having found HB 388 a valid enactment under HCR 41, there was no occasion for the majority to address this issue.
If my opinion in this case were to prevail, this would necessitate that we also address whether HB 388 is constitutional under SCR 519.
Subject to elaboration, I will state my views briefly.
Examining HB 388 under the provisions of SCR 519 presents the following choice.
1. Hold that the 1982 amendment to ง 112 (SCR 519) did not authorize HB 388, and therefore the statute is invalid.
2. Hold that the 1982 amendment to ง 112 (SCR 519) did authorize HB 388.
The latter alternative would of necessity require that we all hold SCR 519 did not pass constitutional muster for the same reason HCR 4 did not.
The pertinent paragraph of SCR 519 reads:
Section 112. Taxation shall be uniform and equal throughout the state. All property not exempt from ad valorem taxation shall be taxed at its assessed value. Property shall be assessed for taxes under general laws, and by uniform rules, and in proportion to its true value according to the classes defined herein. The Legislature may, by general laws, exempt particular species of property from taxation, in whole or in part. [Emphasis added]
It can be seen that if we interpret the underscored sentence to authorize HB 388 it is the same logrolling.
There is an additional objection made very clear by ง 273:
[A]nd if more than one amendment shall be submitted at one time, they shall be submitted in such manner and form that the people may vote for or against each amendment separately; and notwithstanding the division of the Constitution into sections, the Legislature may provide in its resolution for one or more amendments pertaining and relating to the same subject or subject matter, and may provide for one or more amendments to an article of the Constitution pertaining and relating to the same subject or subject matter, which may be included in and voted on as one amendment.
It can been that the present ง 273 does not authorize an amendment by one vote to more than one article of the Constitution, ง 273 is under Article 15.
The amendment, however, authorizing the Legislature to exempt particular species of property is contrary to Article 7, Section 182, which prohibits the Legislature from granting tax exemptions to corporations except under the special conditions described therein. Thus, Article 7, Section 182 provides that there shall be no abridgement of the power to tax corporations except the Legislature may grant exemption from taxation to encourage new industries and enterprises for a period not to exceed ten years.[15]
The underscored provision in SCR 519 completely emasculates Article 7, Section 182, removing all of its restrictions, and gives the Legislature unfettered discretion to grant tax exemptions.
I am therefore of the opinion that SCR 519 is unconstitutional as well.
DAN M. LEE, P.J., and SULLIVAN and GRIFFIN, JJ., join this opinion.

*888 APPENDIX A
Section 112. Taxation shall be uniform and equal throughout the state. Property shall be taxed in proportion to its value. Property shall be assessed for taxes under general laws, and by uniform rules, and in proportion to its value. But the legislature may provide for a special mode of valuation and assessment for railroads, and railroad and other corporate property, or for particular species of property belonging to persons, corporations, or associations not situated wholey [sic] in one county. But all such property shall be assessed in proportion to its value, and no county, other taxing authority, shall be denied the right to levy county and special taxes upon such assessment as in other cases of property situated and assessed in the county. But the legislature may provide a special mode of assessment, fixing the taxable year, date of the tax lien, and method and date of assessing and collecting taxes on all motor vehicles.

APPENDIX B
BE IT RESOLVED ... as follows:
Section 112. Taxation shall be uniform and equal throughout the state. All property not exempt from ad valorem taxation shall be taxed at its assessed value. Property shall be assessed for taxes under general laws, and by uniform rules, and in proportion to its true value according to the classes defined herein. The Legislature may, by general laws, exempt particular species of property from taxation, in whole or in part.
The Legislature shall provide, by general laws, the method by which the true value of taxable property shall be ascertained; provided, however, in arriving at the true value of Class I property, the appraisal shall be made according to current use, regardless of location. The Legislature may provide for a special mode of valuation and assessment for railroads, and railroad and other corporate property, or for particular species of property belonging to persons, corporations or associations not situated wholly in one county. But all such property shall be assessed in proportion to its value according to its class, and no county, or other taxing authority, shall be denied the right to levy county and special taxes upon such assessment as in other cases of property situated and assessed in the county. The Legislature may provide a special mode of assessment, fixing the taxable year, date of the tax lien, and method and date of assessing and collecting taxes on all motor vehicles.
The assessed value of property shall be a percentage of its true value, which shall be known as its assessment ratio. The Legislature shall establish, by general laws, by a three-fifths (3/5) vote of each House, the assessment ratio on each class of property as defined herein, which ratio shall be uniform throughout the state upon the same class of property, provided that the assessment ratio of any one (1) class of property shall not be more than double the assessment ratio on any other class of property. For purposes of assessment for ad valorem taxes, taxable property shall be divided into four (4) classes as follows:
Class I. Real property, except for real property included in Class IV.
Class II. Personal property, except for motor vehicles and personal property included in Class IV.
Class III. Motor vehicles.
Class IV. Public utility property, which is property owned or used by public service corporations required by general laws to be appraised and assessed by the state; however, such property shall not include railroad and airline property or motor vehicles.
BE IT FURTHER RESOLVED, That the Secretary of State is hereby directed to give public notice of an election in the manner and for the time provided by Section 273, Mississippi Constitution of 1890; and an election is hereby called and fixed to be held on the first Tuesday after the first Monday in November, 1982, for the purpose of submitting this and other amendments to the Constitution to qualified electors of other amendments to the Constitution to qualified electors of this state for approval or rejection, said election to be *889 conducted and held as provided by law for statewide general elections.

APPENDIX C

CHAPTER NO. 522

HOUSE CONCURRENT RESOLUTION NUMBER 41
A CONCURRENT RESOLUTION PROPOSING AN AMENDMENT TO SECTION 112, MISSISSIPPI CONSTITUTION OF 1890, TO PRESCRIBE ASSESSMENT RATIOS FOR REVISED PROPERTY CLASSES; TO PROVIDE THAT THE ASSESSMENT RATIO ON ONE CLASS OF PROPERTY SHALL NOT BE MORE THAN THREE TIMES THE ASSESSMENT RATIO ON OTHER CLASSES OF PROPERTY; TO PROVIDE THAT THE LEGISLATURE MAY DENY OR LIMIT A COUNTY OR OTHER TAXING AUTHORITY THE RIGHT TO LEVY COUNTY AND/OR SPECIAL TAXES ON NUCLEAR-POWERED ELECTRICAL GENERATING PLANTS; TO AUTHORIZE THE LEGISLATURE TO PROVIDE FOR A SPECIAL MODE OF VALUATION, ASSESSMENT AND LEVY UPON NUCLEAR-POWERED ELECTRICAL GENERATING PLANTS AND PROVIDE FOR THE DISTRIBUTION OF THE REVENUE DERIVED THEREFROM.
BE IT RESOLVED BY THE LEGISLATURE OF THE STATE OF MISSISSIPPI, TWO-THIRDS (2/3) OF THE HOUSE OF REPRESENTATIVES AND THE SENATE CONCURRING THEREIN, WHICH TWO-THIRDS (2/3) CONSISTS OF NOT LESS THAN A MAJORITY OF THE MEMBERS ELECTED TO EACH HOUSE, That the following proposed amendment to the Mississippi Constitution of 1890 be submitted to the qualified electors of the state for ratification or rejection at an election to be held on the first Tuesday after the first Monday of June 1986:
Amend Section 112, Mississippi Constitution of 1890, to read as follows:
"Section 112. Taxation shall be uniform and equal throughout the state. All property not exempt from ad valorem taxation shall be taxed at its assessed value. Property shall be assessed for taxes under general laws, and by uniform rules, and in proportion to its true value according to the classes defined herein. The Legislature may, by general laws, exempt particular species of property from taxation, in whole or in part.
The Legislature shall provide, by general laws, the method by which the true value of taxable property shall be ascertained; provided, however, in arriving at the true value of Class I and Class II property, the appraisal shall be made according to current use, regardless of location. The Legislature may provide for a special mode of valuation and assessment for railroads, and railroad and other corporate property, or for particular species of property belonging to persons, corporations or associations not situated wholly in one (1) county. All such property shall be assessed in proportion to its value according to its class, and no county, or other taxing authority, shall be denied the right to levy county and/or special taxes upon such assessment as in other cases of property situated and assessed in the county, except that the Legislature, by general law, may deny or limit a county or other taxing authority the right to levy county and/or special taxes on nuclear-powered electrical generating plants. In addition to or in lieu of any such county and/or special taxes on nuclear-powered electrical generating plants, the Legislature, by general law enacted by a majority of the members of each house present and voting, may provide for a special mode of valuation, assessment and levy upon nuclear-powered electrical generating plants and provide for the distribution of the revenue derived therefrom. The Legislature may provide a special mode of assessment, fixing the taxable year, date of the tax lien, and method and date of assessing and collecting taxes on all motor vehicles.
The assessed value of property shall be a percentage of its true value, which shall be known as its assessment ratio. The assessment ratio on each class of property as defined herein shall be uniform throughout the state upon the same class of property, provided that the assessment ratio of any *890 one (1) class of property shall not be more than three (3) times the assessment ratio on any other class of property. For purposes of assessment for ad valorem taxes, taxable property shall be divided into five (5) classes and shall be assessed at a percentage of its true value as follows:
Class I. Single-family, owner-occupied, residential real property, at ten percent (10%) of true value.
Class II. All other real property, except for real property included in Class I or IV, at fifteen percent (15%) of true value.
Class III. Personal property, except for motor vehicles and for personal property included in Class IV, at fifteen percent (15%) of true value.
Class IV. Public utility property, which is property owned or used by public service corporations required by general laws to be appraised and assessed by the state or the county, excluding railroad and airline property and motor vehicles, at thirty percent (30%) of true value.
Class V. Motor vehicles, at thirty percent (30%) of true value.
The Legislature may, by general law, establish acreage limitations on Class I property.
BE IT FURTHER RESOLVED, That, the Secretary of State is hereby directed to give public notice of an election in the manner and for the time provided by Section 273 of the Constitution, for the purpose of submitting this and other proposed amendments to the Constitution to the qualified electors of this state for ratification or rejection, such election to be conducted and held on the first Tuesday after the first Monday of June 1986, in the manner provided by law for statewide general elections.
Adopted by the House of Representatives: April 2, 1986
Adopted by the Senate: April 1, 1986.

APPENDIX D

CHAPTER NO. 507

HOUSE BILL NUMBER 388

* * * * * *
SECTION 3. Of the funds received pursuant to Section 2 of this act by a situs county wherein such nuclear generating plant is located, the board of supervisors of such situs county shall distribute ten percent (10%) of each payment, upon receipt, to the most populous incorporated municipality within the county; however, if such plant is located within a municipality, such payments which would otherwise be made to the situs county pursuant to Section 2 of this act shall be divided equally between the situs county and situs municipality.
SECTION 4. Of the funds retained by the situs county after the payment made pursuant to Section 3 of this act, not more than Five Million Five Hundred Thousand Dollars ($5,500,000.00) per year may be expended by the board of supervisors of the county for any purposes for which a county is authorized by law to levy an ad valorem tax, and any funds in excess of such amount shall be expended in accordance with Section 5 of this act.
SECTION 5. The board of supervisors of the situs county, upon receipt of the payments pursuant to Section 2 of this act less the payment made according to Section 3 of this act, shall pay all such funds in excess if Five Million Five Hundred Thousand Dollars ($5,500,000.00) to the governing authorities of the public school districts in such county in proportion that the average daily attendance for the preceding scholastic year of each school district bears to the total average daily attendance of the county for the preceding scholastic year. Such funds may be expended only for the purposes of capital improvements to school facilities and only after plans therefor have been submitted to and approved by the Educational Finance Commission or its successor. The governing authorities of such school districts may borrow money in anticipation of receipt of payments pursuant to this section and the levying authority for the school district may issue negotiable notes therefor, for the purposes set forth *891 herein. Such loan shall be repaid from the payments received under this section by the governing authorities of the public school district.

APPENDIX E

APPENDIX F

 HCR 41
 % of
 For Against Passage
Adams 620 747 45.3
Alcorn 437 1,133 27.8
Amite 768 1,180 39.4
Attala 893 730 55.0
Benton 224 356 38.6
Bolivar 2,398 1,686 58.7
Calhoun 988 1,259 43.9
Carroll 436 610 41.6
Chickasaw 484 462 51.1
Choctaw 312 332 48.4
Claiborne 461 1,252 26.9
Clarke 1,016 772 56.8
Clay 523 462 53.0
Coahoma 1,843 1,978 48.3

*892
Copiah 1,245 1,491 45.5
Covington 528 1,130 31.8
DeSoto 1,199 383 75.7
Forrest 1,589 5,127 23.6
Franklin 492 730 40.2
George 503 502 50.0
Greene 161 474 25.3
Grenada 1,364 879 60.8
Hancock 1,317 1,717 43.4
Harrison 5,532 3,478 61.3
Hinds 10,080 9,772 50.7
Holmes 1,383 1,644 45.6
Humphreys 691 469 59.5
Issaquena 131 85 60.6
Itawamba 1,156 1,288 47.2
Jackson 3,959 2,432 61.9
Jasper 618 563 52.1
Jefferson 528 350 60.1
Jefferson Davis 441 652 38.6
Jones 3,557 4,246 45.5
Kemper 814 635 56.1
Lafayette 1,100 767 58.9
Lamar 609 1,866 24.6
Lauderdale 3,366 2,029 53.8
Lawrence 1,044 627 62.4
Leake 411 1,229 25.0
Lee 2,130 2,598 45.0
Leflore 1,540 1,271 54.7
Lincoln 2,614 1,643 61.4
Lowndes 2,718 2,365 53.4
Madison 1,787 1,785 50.0
Marion 484 1,229 28.2
Marshall 780 486 61.6
Monroe 648 812 44.3
Montgomery 357 582 38.0
Neshoba 856 1,346 38.8
Newton 976 959 50.4
Noxubee 838 373 69.1
Oktibbeha 851 992 46.1
Panola 944 623 56.9
Pearl River 1,018 616 62.3
Perry 327 920 26.2
Pike 1,823 2,475 42.4
Pontotoc 303 776 28.0
Prentiss 703 537 56.6
Quitman 765 634 54.6
Rankin 4,507 3,156 58.7
Scott 1,593 693 69.6
Sharkey 444 327 57.5
Simpson 931 734 55.6
Smith 804 471 63.0
Stone 337 486 40.9
Sunflower 1,705 1,024 62.4
Tallahatchie 1,067 694 60.5
Tate 738 310 70.4
Tippah 589 772 43.2
Tishomingo 479 441 52.0
Tunica 335 183 64.6
Union 852 712 54.4
Walthall 556 810 40.7
Warren 3,006 3,065 49.5
Washington 3,125 1,908 62.0
Wayne 391 996 28.1
Webster 445 555 44.5
Wilkinson 587 416 58.5
Winston 882 1,194 42.4
Yalobusha 604 253 70.4
Yazoo 1,730 896 65.8
 _______ _______ ____
TOTAL 103,365 100,647 50.6

APPENDIX G
Section 273. Whenever two-thirds of each house of the legislature shall deem any change, alteration or amendment necessary to this Constitution, such proposed amendment, change or alteration shall be read and passed by two-thirds vote of each house, respectively on each day, for three several days; public notice shall then be given by the secretary of state at least three months preceding an election, at which the qualified electors shall vote directly for or against such change, alteration or amendment, and if more than one amendment shall be submitted at one time, they shall be submitted in such manner and form that the people may vote for or against each amendment separately; and if it shall appear that a majority of the qualified electors voting shall have voted for the proposed change, alteration or amendment, then it shall be inserted at the next succeeding session of the legislature as a part of the Constitution and not otherwise. [Emphasis added]
(old)
Section 273. Whenever two-thirds of each house of the Legislature, which two-thirds shall consist of not less than a majority of the members elected to each house, shall deem any change, alteration, or *893 amendment necessary to this Constitution, such proposed amendment, change or alteration shall be read and passed by two-thirds vote of each house, as herein provided; public notice shall then be given by the secretary of state at least thirty days preceding an election, at which the qualified electors shall vote directly for or against such change, alteration or amendment, and if more than one amendment shall be submitted at one time, they shall be submitted in such manner and form that the people may vote for or against each amendment separately; and notwithstanding the division of the Constitution into sections, the Legislature may provide in its resolution for one or more amendments pertaining and relating to the same subject or subject matter, and may provide for one or more amendments to an article of the Constitution pertaining and relating to the same subject or subject matter, which may be included in and voted on as one amendment; and if it shall appear that a majority of the qualified electors voting directly for or against the same shall have voted for the proposed change, alteration or amendment, then it shall be inserted as a part of the Constitution by proclamation of the Secretary of State certifying that it received the majority vote required by the Constitution; and the resolution may fix the date and direct the calling of elections for the purposes hereof. [Emphasis added]
(new)

APPENDIX H

 SCR 519
 % of
 For Against Passage
Adams 1,677 1,384 54.7
Alcorn 2,743 2,197 55.5
Amite 3,064 1,027 74.8
Attala 2,576 1,310 66.2
Benton 1,307 393 76.8
Bolivar 3,613 2,227 61.8
Calhoun 1,879 692 73.0
Carroll 1,527 682 69.1
Chickasaw 2,345 871 72.9
Choctaw 1,847 435 80.9
Claiborne 1,080 428 71.6
Clarke 2,707 866 75.7
Clay 2,639 2,242 54.0
Coahoma 2,999 1,337 69.1
Copiah 3,363 1,790 65.2
Covington 2,313 1,308 63.8
DeSoto 4,791 1,938 71.1
Forrest 6,200 6,136 50.2
Franklin 2,071 1,193 63.4
George 2,418 2,067 53.9
Greene 1,495 957 60.9
Grenada 3,110 1,221 71.8
Hancock 2,849 2,500 53.4
Harrison 10,420 13,831 42.9
Hinds 19,919 13,116 60.2
Holmes 2,295 1,081 67.9
Humphreys 1,322 526 71.5
Issaquena 387 132 74.5
Itawamba 2,650 1,115 70.3
Jackson 12,240 9,049 57.4
Jasper 3,102 835 78.7
Jefferson 859 310 73.4
Jefferson Davis 2,148 1,442 59.8
Jones 7,550 6,161 55.0
Kemper 2,407 481 83.3
Lafayette 2,671 1,334 66.6
Lamar 2,992 2,230 57.2
Lauderdale 8,759 4,490 66.1
Lawrence 2,003 1,315 60.3
Leake 2,951 1,629 64.4
Lee 3,962 3,769 51.2
Leflore 2,746 2,277 54.6
Lincoln 5,535 2,343 70.2
Lowndes 4,567 2,483 64.7
Madison 2,749 1,386 66.4
Marion 4,195 2,416 63.4
Marshall 3,645 788 82.2
Monroe 4,010 2,267 63.8
Montgomery 2,409 705 77.3
Neshoba 3,839 1,363 73.7
Newton 3,514 1,207 74.4
Noxubee 1,922 502 79.2
Oktibbeha 4,275 1,573 73.1
Panola 3,782 1,180 76.2
Pearl River 3,480 2,003 63.4
Perry 1,900 999 65.5
Pike 4,312 3,602 54.4
Pontotoc 1,881 1,337 58.4
Prentiss 2,824 1,113 71.7
Quitman 1,451 539 72.9
Rankin 6,075 3,947 60.6
Scott 3,232 1,211 72.7
Sharkey 1,047 491 68.0

*894
Simpson 4,790 1,575 75.2
Smith 3,773 620 85.8
Stone 1,357 1,017 57.1
Sunflower 3,300 1,770 65.0
Tallahatchie 2,296 535 81.1
Tate 2,569 597 81.1
Tippah 2,144 1,408 60.3
Tishomingo 1,568 1,410 52.6
Tunica 810 193 80.7
Union 3,592 1,002 78.1
Walthall 1,940 859 69.3
Warren 5,118 3,543 59.0
Washington 5,719 4,415 56.4
Wayne 2,850 1,445 66.3
Webster 2,309 805 74.1
Wilkinson 1,733 570 75.2
Winston 3,721 968 79.3
Yalobusha 2,132 479 81.6
Yazoo 4,872 727 87.0
 _______ _______ ____
TOTAL 279,233 157,717 63.9

APPENDIX I
Section 182. The power to tax corporations and their property shall never be surrendered or abridged by any contract or grant to which the state or any political subdivision thereof may be a party, except that the Legislature may grant exemption from taxation in the encouragement of manufactures and other new enterprises of public utility extending for a period of not exceeding ten (10) years on each such enterprise hereafter constructed, and may grant exemptions not exceeding ten (10) years on each addition thereto or expansion thereof, and may grant exemptions not exceeding ten (10) years on future additions to or expansions of existing manufacturers and other enterprises of public utility. The time of each exemption shall commence from the date of completion of the new enterprise, and from the date of completion of each addition or expansion, for which an exemption is granted. When the Legislature grants such exemptions for a period of ten (10) years or less, it shall be done by general laws, which shall distinctly enumerate the classes of manufactures and other new enterprises of public utility, entitled to such exemptions, and shall prescribe the mode and manner in which the right to such exemptions shall be determined.

ON PETITION FOR REHEARING
HAWKINS, Presiding Justice, dissenting:
This case was decided August 10, 1988, on a four-four tie vote, Justice Zuccaro not participating. Justices Robertson, R.N. Lee, Prather and Anderson found that the proposed amendment to Section 112 of the Constitution did not violate Section 273 of the Constitution. Justices Dan M. Lee, Sullivan, J. Ruble Griffin and I were of the view that the amendment to Section 112 did violate Section 273.
A petition for rehearing was filed August 24, a response by appellees October 3, and reply brief of appellants October 10, 1988.
On August 24, 1988, there was also filed a motion for two justices on this Court to certify to the Governor, under the provisions of Miss. Code Ann. ง 9-1-13(3) the disqualification of Justice Zuccaro in order that a Justice to participate in this case could be appointed. This motion was overruled on November 2, 1988.
The petition for rehearing was never presented to an en banc conference of the court during Justice Griffin's lifetime when he would have been able to participate.[1] Justice Griffin was active on the Court and appeared at en banc conferences through November, 1988. This petition could have been, and should have been presented during this time. I recall Justice Griffin had some very strong views on this matter.
The opinion now goes out on a four-three vote, which convinces me that a mistake was made in not sustaining the August 24, 1988, motion of the appellants. Justice Zuccaro has been appointed to fill the interim period pending the Governor appointing a replacement for Justice Griffin. Justice Pittman became a member of this Court on January 3, 1989. Because he was Attorney General while the suit was filed and pending, regrettably he cannot participate, either.
*895 Thus, only seven Justices are participating.
I am aware that this Court has an internal operating rule that a Justice who did not participate in the original decision does not participate in a petition for rehearing. The basic reason for this rule is that the new Justice will not be familiar with the facts. On a case involving a pure question of law, however, and in this case grave Constitutional law, in my view any duly-constituted Justice is fully qualified and should participate in a petition for rehearing.
At the very least this case should be postponed until a replacement Justice has been appointed to succeed Justice Zuccaro, and it is most unfortunate for this State that a case of this magnitude and importance does not have the full attention of a nine-member Court.
NOTES
[1] NO. 507
HOUSE BILL NUMBER 388
AN ACT TO AMEND SECTION 27-35-309, MISSISSIPPI CODE OF 1972, TO PROVIDE FOR PAYMENTS IN LIEU OF AD VALOREM TAXES UPON NUCLEAR GENERATING PLANT PROPERTY AND TO DISTRIBUTE SUCH PAYMENTS TO THE SITUS COUNTY AND MUNICIPALITY, IF APPLICABLE, AND TO COUNTIES AND MUNICIPALITIES WHERE ELECTRIC SERVICE FROM SUCH POWER PLANT IS RENDERED; ETC.
Be it enacted by the Legislature of the State of Mississippi:
SECTION 1. Section 27-35-309, Mississippi Code of 1972, is amended as follows:
(3) Any nuclear generating plant which is located in the state, which is owned or operated by a public utility rendering electric service to the state and not exempt from ad valorem taxation under any other statute and which is not owned or operated by an instrumentality of the federal government shall be exempt from county, municipal and district ad valorem taxes. In lieu of the payment of county, municipal and district ad valorem taxes, such public utility shall pay to the State Tax Commission a sum based on the assessed value of such nuclear generating plant in an amount to be determined and distributed as follows:
(a) The State Tax Commission shall annually assign an assessed value to any nuclear generating plant described in this subsection in the same manner as for ad valorem tax purposes by using accepted industry methods for appraising and assessing public utility property. The assessed value assigned shall be used for the purpose of determining the in-lieu tax due under this section and shall not be included in the ad valorem tax rolls of the situs taxing authority. However, the assessed value so assigned may be used by the situs taxing authority for the purpose of determining salaries of its public officials.
(b) On or before February 1, 1987, for the 1986 taxable year and on or before February 1 of each year thereafter, such utility shall pay to the State Tax Commission a sum equal to two percent (2%) of the assessed value as ascertained by the State Tax Commission, but such payment shall not be less than Sixteen Million Dollars ($16,000,000.00) for any taxable year, all such payments in excess of Sixteen Million Dollars ($16,000,000.00) for any taxable year shall be paid into the General Fund of the state.
(c) After distribution of the payments as set forth in Section 2 of this act, the State Tax Commission shall distribute ten percent (10%) of the remainder of the payments to the General Fund of the state and the balance shall be distributed to the counties and municipalities in this state wherein such public utility renders electric service in the proportion that the amount of electric energy consumed by the retail customers of such public utility in each county, excluding municipalities therein, and in each municipality for the next preceding fiscal year bears to the total amount of electric energy consumed by all retail customers of such public utility in the State of Mississippi for the next preceding fiscal year.
(d) No county, including municipalities therein, shall receive in excess of twenty percent (20%) of the funds distributed under paragraph (c) of this subsection.
(e) The revenues received by counties and municipalities under paragraph (c) of this subsection shall be included and considered as proceeds of ad valorem taxes for the purposes of the growth limitation on ad valorem taxes for the 1987 fiscal year and thereafter under Section 27-39-321 and 27-39-305.
SECTION 2. The in-lieu payments made to the State Tax Commission pursuant to Section 27-35-309(3)(b), excluding payments made in excess of Sixteen Million Dollars ($16,000,000.00) which are required to be paid into the General Fund of the state, shall be distributed by the State Tax Commission as follows:
(a) For fiscal year 1987, fifty percent (50%) of such payment shall be paid to the situs county wherein such nuclear generating plant is located;
(b) For fiscal year 1988, forty-five percent (45%) of such payment shall be paid to the situs county wherein such nuclear generating plant is located;
(c) For fiscal year 1989, forty percent (40%) of such payment shall be paid to the situs county wherein such nuclear generating plant is located;
(d) For fiscal year 1990, thirty-five percent (35%) of such payment shall be paid to the situs county wherein such nuclear generating plant is located;
(e) For fiscal year 1991 and thereafter, thirty percent (30%) of such payment shall be paid to the situs county wherein such nuclear generating plant is located.
SECTION 3. Of the funds received pursuant to Section 2 of this act by a situs county wherein such nuclear generating plant is located, the board of supervisors of such situs county shall distribute ten percent (10%) of each payment, upon receipt, to the most populous incorporated municipality within the county; however, if such plant is located within a municipality, such payments which would otherwise be made to the situs county pursuant to Section 2 of this act shall be divided equally between the situs county and situs municipality.
SECTION 4. Of the funds retained by the situs county after the payment made pursuant to Section 3 of this act, not more than Five Million Dollars ($5,000,000.00) per year may be expected by the board of supervisors of the county for any purposes for which a county is authorized by law to levy an ad valorem tax, and any funds in excess of such amount shall be expended in accordance with Section 5 of this act.
SECTION 5. The board of supervisors of the situs county, upon receipt of the payments pursuant to Section 2 of this act less the payment made according to Section 3 of this act, shall pay all such funds in excess of Five Million Five Hundred Thousand Dollars ($5,500,000.00) to the governing authorities of the public school districts in such county in the proportion that the average daily attendance of the preceding scholastic year of each school district bears to the total average daily attendance of the county for the preceding scholastic year. Such funds may be expended only for the purposes of capital improvements to school facilities and only after plans therefor have been submitted to and approved by the Educational Finance Commission or its successor. The governing authorities of such school districts may borrow money in anticipation of receipt of payments pursuant to this section, and the levying authority for the school district may issue negotiable notes therefor, for the purposes set forth herein. Such loan shall be repaid from the payments received under this section by the governing authorities of the public school district.
[2] Because of its importance, H.C.R. 41 is reproduced in its entirety.

CHAPTER NO. 522
HOUSE CONCURRENT RESOLUTION NUMBER 41
A CONCURRENT RESOLUTION PROPOSING AN AMENDMENT TO SECTION 112, MISSISSIPPI CONSTITUTION OF 1890, TO PRESCRIBE ASSESSMENT RATIOS FOR REVISED PROPERTY CLASSES; TO PROVIDE THAT THE ASSESSMENT RATIO ON ONE CLASS OF PROPERTY SHALL NOT BE MORE THAN THREE TIMES THE ASSESSMENT RATIO ON OTHER CLASSES OF PROPERTY; TO PROVIDE THAT THE LEGISLATURE MAY DENY OR LIMIT A COUNTY OR OTHER TAXING AUTHORITY THE RIGHT TO LEVY COUNTY AND/OR SPECIAL TAXES ON NUCLEAR-POWERED ELECTRICAL GENERATING PLANTS; TO AUTHORIZE THE LEGISLATURE TO PROVIDE FOR A SPECIAL MODE OF VALUATION, ASSESSMENT AND LEVY UPON NUCLEAR-POWERED ELECTRICAL GENERATING PLANTS AND PROVIDE FOR THE DISTRIBUTION OF THE REVENUE DERIVED THEREFROM.
BE IT RESOLVED BY THE LEGISLATURE OF THE STATE OF MISSISSIPPI, TWO-THIRDS (2/3) OF THE HOUSE OF REPRESENTATIVES AND THE SENATE CONCURRING THEREIN, WHICH TWO-THIRDS (2/3) CONSISTS OF NOT LESS THAN A MAJORITY OF THE MEMBERS ELECTED TO EACH HOUSE, That the following proposed amendment to the Mississippi Constitution of 1890 be submitted to the qualified electors of the state for ratification or rejection at an election to be held on the first Tuesday after the first Monday of June 1986:
Amend Section 112, Mississippi Constitution of 1890, to read as follows:
"Section 112. Taxation shall be uniform and equal throughout the state. All property not exempt from ad valorem taxation shall be taxed at its assessed value. Property shall be assessed for taxes under general laws, and by uniform rules, and in proportion to its true value according to the classes defined herein. The Legislature may, by general laws, exempt particular species of property from taxation, in whole or in part.
The Legislature shall provide, by general laws, the method of which the true value of taxable property shall be ascertained; provided, however, in arriving at the true value of Class I and Class II property, the appraisal shall be made according to current use, regardless of location. The Legislature may provide for a special mode of valuation and assessment for railroads, and railroad and other corporate property, or for particular species of property belonging to persons, corporations or associations not situated wholly in one (1) county. All such property shall be assessed in proportion to its value according to its class, and no county, or other taxing authority, shall be denied the right to levy county and/or special taxes upon such assessment as in other cases of property situated and assessed in the county, except that the Legislature, by general law, may deny or limit a county or other taxing authority the right to levy county and/or special taxes on nuclear-powered electrical generating plants. In addition to or in lieu of any such county and/or special taxes on nuclear-powered electrical generating plants, the Legislature, by general law enacted by a majority vote of the members of each house present and voting, may provide a special mode of valuation, assessment and levy upon nuclear-powered electrical generating plants and provide for the distribution of the revenue derived therefrom. The Legislature may provide for a special mode of assessment, fixing the taxable year, date of the tax lien, and method and date of assessing and collecting taxes on all motor vehicles.
The assessed value of property shall be a percentage of its true value, which shall be known as its assessment ratio. The assessment ratio on each class of property as defined herein shall be uniform throughout the state upon the same class of property, provided that the assessment ratio of any one (1) class of property shall not be more than three (3) times the assessment ratio on any other class of property. For purposes of assessment for ad valorem taxes, taxable property shall be divided into five (5) classes and shall be assessed at a percentage of its true value as follows:
Class I. Single-family, owner-occupied, residential real property, at ten percent (10%) of true value.
Class II. All other real property, except for real property included in Class I or IV, at fifteen percent (15%) of true value.
Class III. Personal property, except for motor vehicles and for personal property included in Class IV, at fifteen percent (15%) of true value.
Class IV. Public utility property, which is property owned or used by public service corporations required by general laws to be appraised and assessed by the state or the county, excluding railroad and airline property and motor vehicles, at thirty percent (30%) of true value.
Class V. Motor vehicles, at thirty percent (30%) of true value.
The Legislature may, be general law, establish acreage limitations on Class I property.
BE IT FURTHER RESOLVED, That, the Secretary of State is hereby directed to give public notice of an election in the manner and for the time provided by Section 273 of the Constitution, for the purpose of submitting this and other proposed amendments to the Constitution to the qualified electors of this state for ratification or rejection, such election to be conducted and held on the first Tuesday after the first Monday of June, 1986, in the manner provided by law for statewide general elections."
Adopted by the House of Representatives: April 2, 1986.
Adopted by the Senate: April 1, 1986.
[3] The 1983 amendment to Section 112 altered two provisions of that section. First, it authorized the legislature to exempt particular species of property, in whole or in part, from taxation, an expansion of a power the legislature already possessed, Miss. Const. ง 182. Second, it established a classification system for taxation. Taxpayers argue that there is, in these two provisions, no unity of ultimate object, that the purpose of one is to expand the legislature's power to exempt property from taxation while the purpose of the other is to create a classification system for taxation. Taxpayers argue further that the inclusion of both purposes in the broad category "taxation" is not enough to satisfy the requirement of Section 273. See Kerby v. Luhrs, 44 Ariz. 208, 36 P.2d 549 (1934).

Taxpayers' challenge to the 1983 amendment becomes moot in view of our several holdings below.
[4] See New York Trust Co. v. Eisner, 256 U.S. 345, 349, 41 S.Ct. 506, 507, 65 L.Ed. 963, 983 (1921); see also Cinque Bambini Partnership v. State, 491 So.2d 508, 517 n. 6 (Miss. 1986), aff'd. sub. nom. Phillips Petroleum Co. v. Mississippi, 484 U.S. 469, 108 S.Ct. 791, 98 L.Ed.2d 877 (1988).
[5] Though this be enough, H.C.R. 41 may further be fairly read as relating to a single article of the Constitution. Article 4, Legislative Department. Taxpayers argue that H.C.R. 41 also amends Section 182 found in Article 7, Corporations, in that it amends the legislative power of tax exemption there provided. The point is specious. H.C.R. 41's property classification system simply does not alter Section 182's amendment power beyond the tensions existing between Section 112 and Section 182 long before H.C.R. 41 became a gleam in the legislature's eye.
[6] Without doubt, an excess of retroactivity in application of new law will imperil the integrity and efficacy of a legal system, particularly where citizens have relied to their detriment on prior law, as the late Prof. Lon L. Fuller persuasively demonstrated. See Fuller, The Morality of Law, 51-62 (1964). On the other hand, there are occasions where retroactivity is necessary to promote the integrity and efficacy of the system. Hart, Positivism and the Separation of Law and Morals, 71 Harv.L.Rev. 593, 610 (1958).
[7] If โ twenty years ago โ H.B. 388 had been validly enacted, one would have thought it local and private legislation. We doubt the thought would have occurred to anyone. The combined realities that Mississippi now has one privately owned nuclear power plant and that nuclear power is no longer seen a panacea for the nation's energy ills hardly change the constitutional classification of law like H.B. 388.
[8] See generally Steinglass, Section 1983 Litigation In State Courts (1988); and Steinglass, The Emerging State Court ง 1983 Action: A Procedural Review, 38 U.Miami L.Rev. 381 (1984).
[1] Indeed, Alexander Hamilton recognized that in making amendments to the Constitution, the people should be confronted with but one proposition. In his letters to the Federalist, he wrote:

But every amendment to the constitution, if once established, would be a single proposition, and might be brought forward singly. There would be no necessity for management or compromise in relation to any other point; no giving or taking. The will of the requisite number would at once bring the matter to a decisive issue. [Emphasis added]
Morris v. Mason, 9 So. 776, 814 (La. 1891).
[2] The original ง 112; S.C.R. 519, Ch. 622, Laws of 1982; and H.C.R. 41, Ch. 522, Laws of 1986, are attached as Appendices A. B, and C respectively.
[3] Paragraphs 3, 4 and 5 of H.B. 388 are set forth in their entirety in attached Appendix D.
[4] Appendix E.
[5] See Appendix F for vote by counties. The percentage calculation is my own.
[6] Even the citizens outside the 46 counties were not entirely excluded from possible benefit from the Claiborne County taxes. A substantial sum goes into the General Fund of the state. Thus, there is at least something for every taxpayer in Mississippi by approving the whole package. A carrot was there for every county except Claiborne.
[7] Shall it be taxed to meet the public needs of Claiborne County, or of Claiborne and Warren Counties, or of Claiborne, Warren, Adams and Hinds counties, or of 46 counties? Or of the state at large? All this is left to Legislative enactment.
[8] Both the original ง 273, and as amended in 1958, are set forth in full as Appendix G.
[9] It is significant to note the changes that were clearly made in the 1958 amendment to ง 273:

First, the original ง 273 required that the proposed amendment be read and passed by a two-thirds vote in each house for three days. The three-day requirement was omitted; only one vote is now required.
Second, the original section required that the Secretary of State give public notice three months prior to an election on the proposed amendment. The present ง 273 requires only 30 days' notice.
Third, the original ง 273 required that the proposed amendment receive a majority of the votes cast in the entire election, rather than a simple majority of those voting on the amendment. Thus, if 500,000 voted in an election, but only 200,000 of those voting actually voted on the proposed amendment, it could not have passed even if all 200,000 voted in favor of it. This requirement was one of the reasons this Court struck down the proposed amendment in State ex rel. McClurg v. Powell, supra, 77 Miss. at 568, 27 So. at 929; and posed serious challenges to the Initiative and Referendum Amendment examined in State ex rel. Howie v. Brantley, supra, and Power v. Robertson, supra. This critical obstacle has been removed in the amended ง 273, which only requires that a majority of those voting on the amendment approve.
Fourth, the original section provided that if the proposed amendment passed, then the Legislature at the next session would insert it into the Constitution. The present ง 273 provides that following the election the Secretary of State by proclamation shall insert it into the Constitution.
Finally, the change discussed in the body of this dissent, which permits a proposed amendment to pass muster in the event of a "locational" challenge such as successfully made in Power v. Robertson, supra.
The majority suggests we read a little history (majority opinion, pp. 855-856). Did the majority mean to omit Mississippi history?
[10] Of course, if the original ง 273 itself had specifically spelled out that before there would be a violation of the two-amendment prohibition there would have to be (1) two different subjects, which (2) had two different, unrelated purposes and objectives, and the last provision had been deleted from the 1958 amendment, we would have an entirely different matter. But, the original ง 273 said nothing of the sort, and does not even contain the word "subject."

Indeed, the Court in State v. Jones, supra, did not even have the benefit of our two subsequent cases interpreting the original ง 273, McClurg v. Powell, supra, and Power v. Robertson, supra.
[11] Quoting from the majority, supra: "This is significant in that two amendments may be motivated each by a distinct and separate purpose but may yet pertain to and relate to the same subject or subject matter."
[12] Interestingly, State v. Jones, supra, contains far more persuasive authority for the argument that the 1958 amendment to ง 273 was to further reduce the chance of logrolling than, as the majority supposes, removal of the brakes. The opinion points out at length that while appropriation bills in the legislature must contain but one subject, and a town ordinance cannot contain but one subject, ง 273 (as then written) has no one-subject restrictions.

If the framers of the Constitution had intended to limit the submission of amendments to the Constitution in such a way that each amendment should embrace but "one subject," they could have done so just as they provided in section 69 article 4, that certain appropriations mentioned therein "shall be made by separate bills, each embracing but one subject." The fact that this limitation is found in section 69, and is not found in section 273 of the Constitution, is a circumstance which cannot be ignored in the construction of the latter section.
64 So. at 251.
Most assuredly, the 1958 amendment to ง 273 provides that any time you have more than one amendment โ more than one proposition submitted โ they must "pertain and relate to the same subject or subject matter."
[13] Not as the majority holds in our state, that it imposes no restraint whatever except however some judge decides to define "same subject."
[14] See Appendix H for vote by counties. The percentage of calculation is my own.
[15] Section 182 is set forth in full in Appendix I.
[1] Justice Griffin departed this life December 29, 1988.